## Flood *v.* Logan Iron & Steel Company et al., Appellants.

Argued March 12, 1941. ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮ Before KELLER, P. J., CUNNINGHAM, STADTFELD, RHODES and HIRT, JJ. ▮▮▮▮▮▮▮▮

*Louis Wagner*, with him *Thomas J. Clary* and *Richard A. Smith*, for appellants.

*Paul S. Lehman*, of *Lehman & Fetterolf*, for appellee.

OPINION BY CUNNINGHAM, J., June 30, 1941:

When this workmen's compensation case was before us in 1939 (136 Pa. Superior Ct. 101, 5 A. 2d 621), its history up to that time was set forth at length. As the findings of fact of the compensation authorities upon the issues involved were not sufficiently specific to enable us to decide the questions of law raised by the employer and its insurance carrier by their appeal, we vacated, on April 21, 1939, the judgment against them, remitted the record to the court below, and directed that it be returned to the board for specific findings upon the issues outlined in our opinion.

For present purposes, it is only necessary to recall

that the claimant suffered an accidental injury to his right foot when a piece of iron fell upon it during the course of his employment on July 28, 1931. A bone of his fourth toe was fractured and the soft part of the foot injured. Because claimant had a preexisting ailment—arteriosclerosis—which impaired the blood supply to his foot, the injury did not heal as rapidly as would a similar injury to a normal person. An open agreement was duly executed and approved providing for the payment of compensation for total disability, under Section 306 (a) of our Workmen's Compensation Act of June 2, 1915, P. L. 736, as amended April 13, 1927, P. L. 186, 77 PS §511, at the rate of $13.19 per week.

Under this agreement payments were made until March 7, 1937, a period of 291-6/7 weeks and aggregating $3849.57. On that date the payments were automatically suspended by reason of the filing by the defendants on February 18th of a petition under the second paragraph of Section 413, 77 PS §772, to modify the agreement into an agreement for compensation for "the permanent loss of the use" of claimant's right leg as provided for in paragraph (c) of Section 306, 77 PS §513. The theory upon which this modification was sought was that claimant's injuries had by that time resolved themselves into the permanent loss of the use of his leg, entitling him to receive compensation for a period of only 215 weeks for "all disability resulting from [that] permanent injury." As claimant had already been paid for 291-6/7 weeks the practical result of the granting of the petition would be the termination of the agreement. The referee and board before whom the petition was heard in 1939 sustained claimant's contention that, in addition to the injuries to his foot and leg, other parts and organs of his body had been so injuriously affected by his accidental injury as to cause disabilities, separate, apart and distinct, from

those normally flowing from the loss of the use of his leg, as to entitle him to a continuance of payments under Section 306 (a). Accordingly, an award was made for additional compensation for total disability under Section 306 (a), beginning March 8, 1937—the date upon which payments had been suspended—and to continue, within the limitations of the statute, until claimant's disability changed in extent or ceased.

For the reasons stated at length in our former opinion we vacated the judgment entered by the court below upon that award and returned the record for specific findings upon these issues:

(1)  At the date compensation payments were suspended (March 7, 1937,) had claimant's injury resulted in the permanent loss of the use of his right leg, within the meaning of Section 306 (c)?

(a)  If so, had any other organs or parts of his body been so injured, affected or destroyed, as a direct result of the injuries to his leg, as to cause a disability separate, apart and distinct, from the pain, annoyance, inconvenience, and disability to work normally resulting from the loss of the use of his leg (*Lente v. Luci,* 275 Pa. 217, 119 A. 132)?

(2)  If the use of the leg has not been permanently lost, has he a total disability attributable to the accident?

Pursuant to our order the matter came on in December, 1939, for additional testimony before Referee Patterson, the successor of Referee Lawly. Defendants, having the burden of proof, recalled Doctors H. C. Cassidy and R. R. Decker; claimant, in addition to his own testimony, recalled Dr. F. W. Black and called a new witness, Dr. S. K. Schultz, who declined to express an opinion upon the permanency of his injuries.

Referee Patterson, on February 29, 1940, made findings of fact, the sixth and seventh of which read:

"6.  That the time of the accident and injury on

July 28, 1931, this claimant was fifty-five years of age and was at that time suffering from some generalized arteriosclerosis. At that time this had not reached a stage where it was disabling to any extent. The injury to the right foot described above was in the nature of a crushing injury and so aggravated the arteriosclerosis in the right foot and leg that it was necessary for Dr. Cassidy to perform two operations, one in 1935 and one in 1936 for the purpose of restoring proper circulation to the injured member. After the second operation there was definite improvement in that the swelling was reduced, the foot and leg returned to almost normal pink color and the claimant was able to be on his foot to some extent. Since the opinion submitted by Referee Lawly dated March 31, 1937, in which he found that the claimant had lost the industrial use of the right leg there has been a further improvement in this condition. This improvement is very noticeable to the examining physicians and the claimant himself has stated that he is now able to walk better and greater distances than at the time of the previous hearings before Referee Lawly. The medical evidence also discloses that there may be still further improvement, and for the reasons cited your referee is unable to find that this disability in the foot and leg represents *the permanent industrial loss of use of that member*. (Italics supplied.)

"7. That the claimant now complains of constant pain across the lumbar region of the back, radiating up along the spinal column into the shoulders and arms and into the temples. This pain is at times more severe than others but is constantly present. He also complains that his kidneys have been affected, that he has what he has described as an itching sensation on the neck and hands and that at times when he lies down 'everything will turn black in my room.' He also complains of general loss of strength, that his appetite is poor and of pain in the abdomen near the site of the

scar of the second operation in 1936. Physical examinations reveal that the claimant has some enlargement of the heart downward and to the left and that the heart shows a tendency to myocardial changes. Numerous laboratory tests also show a reduction in functional power of the kidneys to approximately one-third of the normal. Taking into consideration the fact that up until the date of the accident in question on July 28, 1931, this claimant had worked regularly at hard manual labor, that on that date he suffered a crushing injury to the foot followed by the symptoms above described, together with all the medical testimony offered in this case, we must find as a fact that the symptoms above described separate, apart and distinct from the leg condition, are directly connected with the accident of July 28, 1931. We further find as a fact that as a result of the accidental injury of July 28, 1931, and the forced inactivity following that accident there was an aggravation and acceleration of the preexisting general arteriosclerosis. These facts above described have resulted in total disability."

The board dismissed defendants' exceptions to the action of the referee and affirmed his order, denying modification and awarding compensation at the rate of $13.19 per week beginning March 8, 1937, to continue within the provisions of the statute. For the purpose, as stated by the board, "of clarifying the record," it made the following specific additional finding of fact:

"8. From a consideration of all the testimony offered in evidence we find as a fact that the claimant has not sustained the permanent loss of the use of his leg since it has been steadily but somewhat slowly improving, which fact is attested to by both Drs. Black and Cassidy."

In view of this direct negative answer to the primary issue of fact—whether or not the use of the leg had been permanently lost (paragraph (1) above)—the further

inquiries outlined in subparagraph (a) are no longer material if the board's answer is properly supported by the record. It is not contended by defendants that claimant has ever regained any earning power since the accident; attention may therefore be centered upon the main issue.

The only question of law involved in the court below or here is whether the eighth finding by the board is supported by competent and substantial medical evidence, i. e., expressions of expert opinions, measuring up to the test prescribed in *Elonis v. Lytle Coal Co.,* 134 Pa. Superior Ct. 264, 3 A. 2d 995, and "affording a substantial basis" (*Wilbert v. Com. of Pa. Second Injury Reserve Account et al.,* 143 Pa. Superior Ct. 37, 17 A. 2d 732) for the finding.

In this connection it is proper to bear in mind the legislative conception of the "permanent loss of the use" of a member as that phrase is used in Section 306(c). As stated by this court in *Kerfonte v. Carrolltown Coal Company et al.,* 94 Pa. Superior Ct. 19: "If the injury is permanent, resulting in the actual loss [i. e. amputation] of a [leg] or the permanent loss of its use equivalent to the loss of the [leg], the schedule fixed in Section 306(c) applies." Moreover, the compensation therein provided for covers "all disability" and incapacity to work, "whether such incapacity be total, partial or no incapacity at all": *Lente v. Luci,* supra. See also *Reigle v. Sholly,* 140 Pa. Superior Ct. 153, 14 A. 2d 166, and *Moule v. Barrymore Corp.,* 124 Pa. Superior Ct. 529, 189 A. 523. It should also be noted that the word "industrial," so frequently used by counsel and by the compensation authorities in cases involving the "loss of the use" of a member, is not found in Section 306(c). Defendants, in applying for modification, assumed the burden of proving that the condition of claimant's leg had progressed to the point

where the loss of its use had become so permanent as to be equivalent to its amputation.

Upon their appeal to it, the court below in a careful and accurate opinion by UTTLEY, P. J., reviewed the testimony and reached the conclusion that defendants had not met the burden of proof resting upon them and that their exceptions to the action of the board should be dismissed. On November 30, 1940, judgment was accordingly entered in favor of claimant upon the award, in which defendants were given credit for all payments theretofore made by them; the present appeal is from that judgment, entered nearly ten years after the accident.

Our examination of all the testimony taken before both referees has convinced us that the finding by the board that "claimant has not sustained the permanent loss of the use of his leg" is supported by competent and substantial evidence.

At the first hearing Dr. Cassidy, called by defendants, stated he first saw claimant on July 28, 1931, when he was referred to him "because he had a fracture of the metatarsal of the fourth toe of his right foot." Several months later it was found that the injury was not healing normally because "there was an impairment of the circulation in the foot." By January 28, 1937, however, the fracture had healed as shown by an X-ray of that date. After testifying he had treated claimant many times between the dates of the accident and the first hearing, the witness continued: "Q. Now, will you tell the referee what the physical condition of the foot [was] at the last time you examined him? A. The foot is swollen, it is pinkish in color, there is no pulsation in the arteries that supply the foot, and there is tenderness on pressure over both the longitudinal and the transverse arches of this foot. Q. And what do you ascribe these conditions to? A. To a poor blood supply. Q. And what is the cause of the poor blood supply? A.

This man has arteriosclerosis and following his injury to that foot, this injury apparently was enough to up-set the equilibrium, of the particular blood supply to this foot, and it has never recovered, and in my opinion will not recover more than it has to the present date. Q. Has the effect of the injury upon the arteriosclerotic arteries been confined to this foot? A. Yes. Q. Now, you performed certain operations with the hope of re-lieving this impairment of blood supply, didn't you? A. I did. Q. Will you tell the referee what you did and when, about? A. On 9-2-35, because this foot was cold, purple and apparent gangrene was impending in the toes, and in order to prevent amputation, it was de-cided to try and improve the blood supply to the foot by relieving the constricture nerve impulses to the blood vessels of this foot. This was done in two ways, first, by removing the sympathetic nerves from around the femoral artery to the foot, which gave some but not much benefit. And he submitted to another operation on 1-17-36 at which time the sympathetic chain of con-stricture nerves to the right lower extremity was in-terrupted in the lumbar region of the spine. This re-sulted in the foot becoming warm, where it had been cold before, resulted in the color changing from purple to pink, and *did prevent amputation."* (Italics sup-plied.)

With reference to the condition of the foot at the date of the first hearing, excerpts from Dr. Cassidy's testi-mony read: "Q. Can you think of any other treatment that could be resorted to that would be of any benefit to improve the function of that right foot? A. No. Q. In your opinion, is the condition there fixed and perma-nent? A. Yes ...... Q. Have you asked him (claim-ant) about the extent that he is able to use the foot? A. Yes. Q. And to what extent does he say to you that he is able to use it? A. He can't walk more than two blocks at a time ...... Q. What is your opinion so far

as gainful industrial occupation is concerned as to whether he has lost the use of that foot? A. He has lost the use of the foot for industrial occupation."

At the first hearing claimant testified he was then sixty-one years of age and could use his foot "some" but "not to do any work." When recalled at the second hearing, some three years after the first, Dr. Cassidy said there was by that time some improvement in the foot —"lessened swelling and improved color"—that claimant said he was able to stand longer and walk farther; that the foot might get better, but in the opinion of the witness would not.

Returning to the first hearing, Dr. Decker, also called by defendants, said be examined claimant's foot in March, 1937; he agreed with Dr. Cassidy relative to its condition and was of opinion that it was at that time of no use to him in any "gainful industrial occupation." At the second hearing this witness stated he could not say whether the foot had improved, but claimant told him at his last examination it had.

At the first hearing the medical witness called by claimant was Dr. Black. He examined the claimant several times shortly before the hearing. After describing the condition of the foot his testimony continued: "Doctor, will you state whether or not in your opinion Thomas Flood is now totally disabled from engaging in manual labor? A. In my opinion Mr. Flood is totally disabled from engaging in manual labor which would require either standing or walking. Q. Will you state whether or not in your opinion the foot and leg of the patient are now useless for gainful employment and will always remain so? A. The foot and leg are *now* useless for gainful employment and *may* always remain so. Q. State whether or not there is a *possibility* that the foot and leg may improve to permit some use to be made in the future of these two injured members,

the foot and the leg? A. I would say that such a possibility does exist." (Italics supplied.)

When recalled at the last hearing, Dr. Black testified he had made a number of examinations of claimant during the interval between the hearings. After describing in detail various indications of improvement in the foot and leg, the witness, in reply to the question whether the loss of use was permanent, said: "A. I would say that he has a permanent loss at the present time, but in view of the fact that there has been definite improvement, I mean improvement such as I can definitely testify to because I have seen the difference, I think there is no absolutely positive statement that could be made on just what the future holds for this man ...... I couldn't say positively that there wouldn't be further improvement, and in view of the fact that there has been improvement ...... during the past year or eighteen months or two years ...... it is more or less logical to conclude that there may be further improvement, in which case he might not prove to be a total permanent disability. I am inclined to that view although after all it is a matter of opinion and must be based upon what already happened. I think I testified earlier in the history of this case that I thought probably he would be a permanent disability. I was wrong. I don't want to be wrong twice on the same question. Now, in the light of developments since I testified to that opinion he has made some improvement, proving that I was wrong. Why shouldn't he make some further improvement? ...... I think that Mr. Flood has a disability in that leg which will always remain in some degree permanent, but what degree I can only guess. He may improve enough to go back to some kind of work. I think there is no certainty on that, but on the other hand there is no certainty that he won't in view of the fact that he has made a rather surprising

improvement in the last two years. I don't believe the leg will ever recover fully."

Claimant's own direct testimony at the last hearing upon the question with which we are now concerned reads: "Q. How is your foot, the injured foot? A. It is better than it was. Q. In what way? A. Well, I can walk further on it, it ain't swollen quite as much, a better color than it had. Q. Has this improvement been continuous? A. Yes sir."

Upon cross-examination, he continued: "Q. Mr. Flood, when did you notice your right foot was beginning to get somewhat better? A. Well, I will say after it busted open and pus and stuff worked out of it. Dr. Cassidy doctored it for me. Q. That is about two years ago? A. Around, I couldn't tell you exactly but I would say around two years. Q. That would be shortly after your last hearing in the case? A. Yes. Q. And since that time you have noticed that you are able to walk further? A. Yes sir, I get around better; it don't hurt me near so much. Q. And you have been walking further? A. Some further, yes sir. Q. And on your foot a good deal more than you were before that? A. Yes, it don't hurt me so. Q. In other words, you are more active since you say you noticed your foot getting a little bit better than you were before? A. In that part, yes, but in the body worse. Q. When I say more active you are up and about more? A. Yes."

Insofar as the foregoing medical opinions are in any way conflicting, it was for the referee and board to decide which prognosis they would adopt. Considered together, none of them goes far enough to support a finding that the injuries to claimant's foot and leg have rendered his leg as useless as it would have been if amputated. We agree with the court below in the conclusion that the petition for modification was properly dismissed.

Judgment affirmed.