Berkhamer *v.* Heinsling et al., Appellants.

Argued October 27, 1942.

462

*Paul E. Hutchinson,* of *Sherriff, Lindsay, Weis &
Hutchinson,* with him *Homer I. Smith,* of *Scheeline,
Smith & Leopold,* for appellants.

*Park H. Loose,* for appellee.

OPINION BY CUNNINGHAM, J., November 11, 1942:

The issue in this workmen's compensation case arose
through the filing of a petition by the insurance car-
rier, for itself and on behalf of the employer, for the
modification of an open agreement for total disability,
having a potential life of 500 weeks, into an agreement
or award under §306(c) of the Workmen's Compensa-
tion Act of 1915, as amended April 13, 1927, P. L. 186,
77 PS §513, for a definite period of 215 weeks for the
permanent loss of the use of a leg.

On September 17, 1937, the claimant, Dora Berk-
hamer, 70 years of age, while in the course of her em-
ployment in the starch room of the Logan Laundry,
where she had worked continuously for more than
thirty years, slipped and fell, sustaining an injury de-
scribed in the agreement as a "fracture [of the] lower
end of [her] right femur with fragments in fairly good
position." Immediate total disability followed and on
November 4, 1937, the parties executed, and the board
approved, an agreement for the payment of compensa-
tion, under §306(a), at the rate of $7.80 per week, be-
ginning September 24, 1937.

Although given skillful hospital treatment for several months a union of the broken bone was not effected; the fracture "slipped so that the upper fragment rode down over the lower fragment almost to the knee joint." She was discharged to the care of her family physician with the expectation that if her general health improved sufficiently she would return for an operation. She was confined to bed for a year in the home where she lived with her daughter, Mrs. Myrtle White, and was then able to walk, with crutches, about the house.

On December 16, 1939, the petition for modification was filed upon the theory that claimant's injury had resolved itself into the permanent loss of the use of her right leg and, therefore, the extent of her employer's liability to her had been reduced to the period of 215 weeks fixed by §306(c) for such permanent injury.

The contention in behalf of claimant, in reply to the allegations of the petition, was that all the injuries sustained by her in her accidental fall were not set forth in the compensation agreement; and that, in addition to the fracture of her leg, she sustained such injuries to the ligaments supporting her uterus that a complete prolapse of that organ resulted, thereby causing a total and permanent disability, separate and distinct from that incident to the fracture of her leg, and entitling her to compensation under §306(a).

The issue, therefore, before the compensation authorities was whether claimant, in addition to her broken leg, had sustained in the fall injuries to other organs and parts of her body which caused a disability, distinct and apart from that which would normally flow from the loss of the use of a leg and extending beyond the period of 215 weeks fixed in §306(c). If such injuries caused total disability they would be compensable under §306(a): *Lente v. Luci,* 275 Pa. 217, 119 A. 132.

Petitioners had the burden of proving: (1) That the loss of the use of claimant's right leg is permanent,

(*Flood v. Logan I. & S. Co. et al.,* 145 Pa. Superior Ct. 206, 212, 20 A. 2d 792; *Zellner v. Haddock Mining Co.,* 139 Pa. Superior Ct. 16, 19, 10 A. 2d 918); and (2) that the incapacity to labor from which claimant was then suffering, regardless of its extent, was such as would naturally be incident to the loss, or loss of use, of a leg.

As to the first proposition, it is conceded that claimant has permanently lost the use of her leg; the extent of disability attributable to that loss is immaterial, because, as stated in *Lente v. Luci,* supra, the legislative mandate of §306(c) fixed the amount to be paid in such cases "without considering, but including, all incapacity to labor that may be connected therewith, whether such incapacity be total, partial or no incapacity at all"; but the extent of disability is material under §306(a) and §306(b). There was uncontroverted medical testimony that the condition of claimant's uterus of itself totally disabled her.

The seriously contested feature of the case was the existence of a causal connection between the accident and claimant's disabling uterine condition. We agree with counsel for the petitioners that medical testimony was necessary upon that issue. As a result of the hearings before him, the referee, after making findings of fact relative to the happening of the accident, continued in his sixth finding as follows: "She (claimant) was taken immediately to her home and later that day was removed to the Altoona Mercy Hospital. For a period of about one year following that the claimant was unable to be on her feet, being confined to her bed or in a chair. At the expiration of about one year she began to walk with the aid of crutches, and at that time discovered an abnormal condition in the pelvic region. This condition has been diagnosed as a [complete] prolapse of the uterus. This condition was not discovered immediately following the accident by rea-

son of the fact that the claimant was confined to her bed and the prolapse of the uterus did not become manifest until the claimant was on her feet attempting to walk. The claimant is now confined to bed and has been since the early part of May, 1940, and is now totally and permanently disabled. We find from the evidence that *the disability of the claimant is not confined to the loss of use of the right leg, that the prolapse of the uterus of itself would be totally disabling, and that the total permanent disability of the claimant is the direct result of the accidental injuries of September 17, 1937."* (Italics supplied.)

The referee accordingly held, as a matter of law, that petitioners were not entitled to have the agreement modified; an order was entered awarding claimant compensation at the rate of $7.80 per week, beginning on the seventh day after the accident and to continue within the limitations of the statute for a period of 500 weeks, petitioners to take credit for the compensation already paid. The board affirmed the findings of fact, conclusion of law and award of the referee; the court below dismissed the exceptions of the employer and its carrier and entered judgment upon the award; from that judgment we have the present appeal by them.

The board having found the facts against the parties seeking modification, the only question of law here involved is whether the record contains substantial and competent evidence supporting the finding of a causal connection between the accident and claimant's present disability attributable to the condition of her uterus.

Four hearings were held,—the last at the home of claimant, because of her inability to leave the house. Certain details of the accident have a material bearing upon the question of causal connection. The claimant gave this description: "Q. And what were you doing at the time the accident occurred? A. I was scrubbing the laundry floor which I had to do. Q. Now, how

were you scrubbing that, were you standing up or how? A. Yes, sir, with a broom; a bucket of hot water and taking the broom and scrubbing it. Q. And at the time the accident happened where was the bucket of water? A. Well, I had the floor scrubbed and I went to rinse this dirty water down off the floor and I got a bucket of warm water at the hydrant and I walked across to the floor where I had scrubbed and I went to pour it on, my feet flew from under me and I fell down backwards on my rump the length of myself, and the bucket rolled over from me on to the floor and the water was all in a puddle and I fell right in that puddle of water ...... Q. You say you knew you had broken your leg? A. Well, I couldn't use it; I couldn't straighten it out or anything, and I hurt myself on. my back, I couldn't raise myself up, I was just so bad hurt I couldn't help myself at all. Q. Where were you suffering pain at that time? A. Why, I was suffering all over pain."

Claimant's statement as to the manner in which she landed on the floor was corroborated by Ruth Black, a fellow employee who was in the room at the time. This witness said claimant was sitting flat on the floor holding her knee. One of the medical experts called by claimant was Dr. Richard S. Magee who examined her during the course of the hearings—May 10, 1940. After expressing his opinion that claimant is permanently and totally disabled and that her incapacity is greater than that which would normally flow from the loss of the use of her leg, his testimony continued: "Q. From the history of the case, the complaints and your physical examination can you state whether or not her present condition is a result of the accident which she sustained on September 17, 1937? A. Of course, I never saw Mrs. Berkhamer until May 10th of 1940. Unless I would have competent information that this prolapse had been present previous to that time I would be of

the opinion that the accident was directly responsible for the prolapse."

Upon the question whether claimant ever had any indication of uterine trouble prior to the accident, the record contains these positive statements by her: "Q. Mrs. Berkhamer, you are now suffering from a condition of the uterus? A. Yes, sir. Q. That causes the uterus to fall out; is that correct? A. Yes, sir. Q. Prior to the time this accident happened did you have any of this condition as it now exists? A. No, sir. Q. Did you have any trouble at all with the uterus? A. No, sir, I was able to work each and every day. Q. About how long after the accident occurred was it that you first realized that there was trouble with the uterus? A. Well, see, I wasn't able to be out of bed or walk for a year nearly, and then when I got able to walk that I walked with crutches I discovered it. Q. That is, when you began having trouble with it falling out? A. Yes, sir, after they fetched me from the hospital the doctors ordered me to stay two months in bed, and I stayed two months in bed that I wasn't able to be out of bed at all; when I was out of bed I was just from the bed into a rocking chair and sat in the rocking chair. Q. How did you get to work before this accident happened? A. Well, I went down here and got the bus, the Greenwood bus at six o'clock in the morning. Q. About how far away from your home is that bus station? A. It is about three squares or more. And if I didn't go down here and get the bus I went out here and got a Third Avenue car, and I guess it is a mile near from here to the Rosehill Cemetery, and went on the Third Avenue car and transferred to a Second Avenue car. Q. Then you walked each morning either to the bus station or to the trolley station; is that correct? A. Yes, sir. Q. Were you suffering from any ailment whatsoever prior to the time this accident occurred? A. No, sir; you may know when I starched

nine hundred shirts a week and worked each and every day and all the other work that was fetched in there, nothing ailed me, and that's what I done. Q. When you were doing that work would you be sitting or standing? A. No, sir, standing, you have to stand up all the time; we never sit down only when we eat our dinner, or I never did ...... Q. At the time you were hurt you weren't doing starch work, were you? A. Well, the work wasn't up, I had to scrub the floor, and I scrubbed it. Q. How long had you been doing scrubbing work? A. Ever since I worked in that place I had to scrub my own starch floor." Claimant was fully corroborated as to the above details by her daughter.

Relative to the failure of claimant to discover and complain about the injury to her uterus until nearly a year had elapsed after the accident, an excerpt from the cross-examination of Dr. Magee reads: "Q. Doctor, don't you think a fall sufficient to cause a prolapse of the uterus would be accompanied with pain in the pelvic region that would be noticeable to the patient? A. Well, as I say, if she had sufficient pain elsewhere and if she fell on her buttocks evidently that was quite sore, she could have it without noticing it a great deal. Q. How long before she would notice it? A. Well, it may not show itself until she gets around on her feet. Q. As a matter of fact, it hadn't prolapsed until she was on her feet? A. It hadn't come out completely until she was on her feet."

We are of opinion that when the testimony of Dr. Magee is read in connection with that of the claimant and her daughter it measures up to the standard of proof fully considered and defined in *Elonis v. Lytle Coal Co.*, 134 Pa. Superior Ct. 264, 3 A. 2d 995.

It is true that one of the doctors called by appellants definitely expressed the opinion there was no causal connection between the accident and the prolapse of the uterus. He was also of opinion that the fracture of

claimant's leg could not have been produced by falling upon her buttocks, but the evidence of claimant and of the only eye witness of the accident established that the fracture was, in fact, received in that kind of a fall.

It was within the exclusive province of the board to weigh these conflicting opinions in the light of all the evidence and choose between them.

We are satisfied, upon a consideration of the entire record, that the board's finding, to the effect that when claimant slipped and fell she sustained not only a broken leg but also an injury to her uterus which in and of itself resulted in total and permanent disability, is supported by substantial and competent testimony. It follows that appellants are not entitled to any modification of their original agreement.

Judgment affirmed.