## Caddy *v.* Johnstown Firemen's Relief Association of the State of Pennsylvania, Appellant.

494

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER, JAMES and RHODES, JJ.

*Frank P. Barnhart,* of *Barnhart & Adams,* for appellant.

*Albert W. Stenger,* for appellee.

OPINION BY KELLER, P. J., January 27, 1938:

The issue of fact for the jury in this case was whether there had been a valid common-law marriage between the plaintiff, Bertha Caddy, and James H. Caddy, who was a member of the defendant beneficial association. If there was, plaintiff, as his widow, is entitled to an affirmance of her judgment against the defendant.

We had occasion in *Murdock's Est.,* 92 Pa. Superior Ct. 275, to consider at some length the subject of common-law marriages in this State, and it is not necessary to repeat what we there said. In Pennsylvania, marriage is a civil contract and does not require a ceremony before officers of church or state to complete it, but it may be entered into by the parties themselves in words of the present tense, with a view and for the purpose of then and there establishing the relation of husband and wife.

Cohabitation and reputation that the parties are married do not constitute a legal marriage—not even a common-law marriage—, but they are evidence from which a marriage may be found, if the circumstances are sufficiently strong and convincing to satisfy the triers of fact. If, however, the alleged widow is not satisfied to rest her case on reputation and cohabitation and attempts to prove the marriage by evidence of what occurred at the time of the alleged contract of marriage, and the evidence establishes that no marriage took place, the presumption arising from reputation and cohabitation, no matter how strong, must give way to the positive proof that no contract was made: *Bisbing's Est.*, 266 Pa. 529, 109 A. 670; *Edwards v. Enterprise Mfg. Co.*, 283 Pa. 420, 129 A. 449; *McDevitt's Est.*, 280 Pa. 50, 124 A. 294.

It is not necessary for us to state the evidence of reputation and cohabitation in this case. It was amply sufficient to support a finding by the jury that the parties had been legally married. But the plaintiff did not rest her case on the presumption arising from cohabitation and reputation. She testified, herself, as to the circumstances attending the alleged marriage, and the real point in issue here is whether the facts as testified to by her, show that no marriage had in fact taken place within the rule laid down by the decisions.

In the first place, we have, here, no evidence of a meretricious relation between the parties existing prior to the date of the alleged marriage, as there was in most of the cases cited by appellant—for example, *Craig's Est.*, 273 Pa. 530, 117 A. 221; *Stevenson's Est.*, 272 Pa. 291, 116 A. 162; *McLaughlin's Est.*, 314 Pa. 574, 172 A. 107. See also, *Bisbing's Est.*, supra; *McDevitt's Est.*, supra; *Edwards v. Enterprise Mfg. Co.*, supra. The statement that they 'kept company' does not imply an immoral connection. They could not marry because

he had a wife living from whom he was not then divorced. Caddy's wife secured a divorce on November 7, 1918 and thereafter they kept steady company, seeing each other once a week on his day off from his work with the City of Johnstown Fire Department. They became engaged to be married. A day was set for the wedding. He bought her an engagement ring and a wedding ring. On the day first set for the wedding something occurred to prevent it and they then fixed Wednesday, January 6, 1926 as the date. He rented a house at No. 127 Garfield Street, and the day before the day fixed for the wedding she furnished the house. On January 6, 1926 he came for her in his car and they went to get married and "were going up Prospect and ran into a Stutzman Feed truck. He stopped to leave a couple boys off and we weren't paying attention and ran into it and knocked the fender down against the wheel, blowed out a tire and had to have it towed" back to Johnstown. The repairs to the car would not be finished until evening and to pass the time they went into a picture show. While there, the following occurred, as disclosed by the notes of testimony:

By Mr. Stenger:

"Q. What if anything happened during that afternoon, was anything said by him to you or you to him that might be material here?

A. Yes, sir.

Q. What was it?

A. Well, he said,—we made the contract to live together as man and wife without a ceremony by a preacher or priest.

By Mr. Barnhart: This is objected to as being a conclusion and we move it be stricken from the record.

By the Court: Objection sustained, motion granted, and the testimony is directed to be stricken out. Exception noted and bill sealed for the plaintiff.

IVAN J. McKENRICK, J. (Seal)

By Mr. Stenger:

Q. What was said as near as you can remember now?

A. Well, he asked me if I was willing to live that way.

Q. What did you say?

A. I said yes, I was because we had tried once before to go and get married and had bad luck, so we just made that contract.

By Mr. Barnhart: This answer is objected to as being incompetent, irrelevant, immaterial and inadmissible, and it calls for a conclusion; further, it does not comprise words in the present tense.

By the Court: We sustain the motion to strike out that part of the answer which says 'So we just made that contract'. Exceptions noted and bills sealed for plaintiff and defendant.

IVAN J. McKENRICK, J. (Seal)

By Mr. Stenger:

Q. State whether or not you agreed then and there to become husband and wife?

A. Yes, sir.

By Mr. Barnhart: Objected to for the following reasons: It asks for a conclusion; second, it does not undertake to give words in the present tense of the contracting parties; third, it is incompetent, irrelevant, immaterial and inadmissible. We move that question and answer be stricken from the record.

By the Court: Objection overruled and motion to strike out denied, exception noted and bill sealed for the defendant.

IVAN J. McKENRICK, J. (Seal)

By Mr. Stenger:

Q. Just tell us, Mrs. Caddy, as near as you can, what Mr. Caddy said to you at that time? What did he say when he made the proposition you have testified to, as near as you can.

498

By the Court:

Q. Recall, if you can, the exact words he said and what you answered to him in response to his questions, because we have to determine whether there was a contract.

A. Well, he said, 'We can live together as common law people', and I can't tell you exactly any more how it was.

By Mr. Stenger:

Q. What did you say to him when he said that to you?

A. I said I was satisfied.

Q. At or about the time those words were spoken between you two, what if anything was done with the wedding ring?

A. He took it out of this little box he had,—I have the box yet,—and put it on my finger.

Q. Did you continue wearing that wedding ring?

A. Yes, sir." (pp. 38a-40a)

It is clear that when the witness said, "he asked me if I was willing to *live that way*", she was referring to her previous answer which had been excluded by the court, "We made the contract to live together as man and wife without a ceremony by a preacher or priest"; and so understood her answer would read, "He asked me if I was willing to live that way—that is, to live together in the relation of man and wife without a ceremony by a preacher or priest". To which she said, "yes". After which he said, in substance, "We can live together as common law people" and she said "I am satisfied", and then he took the wedding ring he had bought for the wedding ceremony and put it on her finger, and after they came out of the show and had supper, he got the car which was fixed by that time, and they drove together to the house they had furnished and started living as husband and wife. They lived together continuously as man and wife until his death.

He introduced her as such to people generally; to the family doctor; to the assessor; to the lawyer who drew the sale agreement and deed for a property he owned in common with his brothers and sisters, and which she signed as his wife; to the officers of the bank where they kept a joint account as husband and wife until the bank reorganized; at the hospital where she signed the operation permit; and they were generally so recognized. This defendant association paid the plaintiff, as "Mrs. James Caddy", the funeral benefit of $250 provided for by the by-laws.

It is true defendant's counsel, as stated above, moved to strike out the question and answer above given, "Q. State whether or not you agreed then and there to become husband and wife. A. Yes, sir"; and assigns the refusal of the court to do so for error; but the error, if any, incident to this was cured on his cross-examination of the witness—to which no objection was made—as follows: "Q. You weren't married in Pittsburgh or down east? A. No sir, we made the contract in the Grand Theater on Main Street, Johnstown" (p. 80a).

Unlettered persons frequently become confused in the use of tenses and it is difficult to get them to testify to the exact language used in a conversation, in words of the first and second person and using the present tense, rather than their understanding of its import, in words of the third person and using the past tense; but when it is considered that the parties had started on their way to get married that day, and had been interrupted by an accident, we think the testimony of the plaintiff, instead of establishing that no marriage contract was made between them, is entirely consistent with a finding that the parties agreed and consented then and there to become husband and wife and live together in that relation, without a marriage ceremony, and that following that agreement they cohabited to-

gether as husband and wife and were generally recognized and reputed to be such, until his death. See *Sullivan v. American Bridge Co.,* 115 Pa. Superior Ct. 536, 176 A. 24; *McGrath's Est.,* 319 Pa. 309, 179 A. 599.

The circumstances all point to the commencement of a valid common-law marriage relation rather than a meretricious one.

We think the matter is fairly and aptly stated in the opinion of Judge McKENRICK of the court below, as follows: "We can conceive many varieties of declarations which might satisfy the law as to the validity of the contract. We took the position at the time of the trial, and are still of the opinion, that there was sufficient, if believed by the jury, to warrant a finding that there was a valid marriage. Nothing was left to the future; everything was intended as being in the present. The wedding ring was placed upon her finger by James H. Caddy, and we must attach some significance to that act. A wedding ring signifies that the one who presents and the one who receives are wedded. Everything that could be done was done in the course of a single transaction. The subject-matter of the discussion was the living together as husband and wife, preceeded by an engagement and the intention to marry. Bertha Caddy was satisfied and expressed herself as being satisfied with the arrangement and accepted the ring in token of the complete understanding that existed between her and James H. Caddy. From that moment until the death of James H. Caddy, Bertha Caddy considered herself as the lawful wife of James H. Caddy and in turn was recognized as such by James H. Caddy, and no doubt existed in the mind of either that they were husband and wife."

The assignments of error are overruled and the judgment is affirmed.