Wilbert *v.* Commonwealth of Pennsylvania Second
Injury Reserve Account et al., Appellants.

38

Before Keller, P. J., Cunning-ham, Baldrige, Stadtfeld, Parker, Rhodes and Hirt, JJ.

*S. H. Torchia,* with him *Ralph H. Behney* and *Claude T. Reno,* Attorney General, for appellants, No. 176.

*W. Glenn George,* with him *Ralph N. Kellam,* for appellant, No. 187.

*H. J. Seman,* for appellee.

Opinion by Keller, P. J., January 30, 1941:

These two appeals grew out of the same claim for workmen's compensation. They arise under the Act of July 2, 1937, P. L. 2714, which is a supplement to the Workmen's Compensation Act of June 2, 1915, P. L. 736, as amended, and provides for the inclusion of certain occupational diseases within its scope.

The pertinent facts relative to the claim may be stated as follows:

On April 22, 1938 Lawrence Wilbert, residing at 2452 Leithgow Street, Philadelphia, filed a claim (No. 75,789) for compensation against his employer, Pecora Paint Company, and its insurance carrier, American Mutual Liability Insurance Company, and against the Commonwealth, payable out of moneys to the credit of the Second Injury Reserve Account in the State Workmen's Insurance Fund, averring that he had worked for eight years in the Asbestos Department of said employer and had been disabled since January 7, 1938 because of silicosis. Answers were filed by the several defendants. A hearing was had on June 29, 1938 and the testimony of the claimant was taken, in the course of which he testified in response to questions of the referee that he was married and had two step-children, neither of whom was dependent on him—one was then thirty-seven years and the other thirty-four years old.

On August 31, 1938 Lawrence Wilbert died, and on September 22, 1938 Mary Wilbert filed a claim petition (No. 77,795) as his dependent widow. In filling out her claim blank, in response to the direction, "If claimant is a widow or widower state date and place of marriage; and if marriage was a common law marriage, so state"—she inserted, "September 9, 1912, Wilmington, Delaware", and said nothing about a common law marriage. Answers were filed (1) by the State Workmen's Insurance Fund as custodian of the Second Injury Reserve Account and (2) by the employer and its insurance carrier; the former requiring proof that the alleged occupational disease had developed to the point of disablement only after an exposure of five or more years, as provided in section 7(a) of said Act of 1937; and the latter denying that decedent died of silicosis, or that the claimant was dependent on him and demanding proof of her relationship to him.

Hearings were had and testimony was taken in her behalf at two meetings before the referee, December 9 and December 29, 1938.

On January 26, 1939 the referee filed his decision setting forth that Lawrence Wilbert had died on August 11, 1938; that the case No. 75,789 had been considered in conjunction with claim petition No. 77,795, filed by decedent's widow; and dismissing that petition. At the same time he rendered his decision under claim petition No. 77,795, filed by Mary Wilbert, finding inter alia: "(3) That Lawrence Wilbert while working in the employ of defendant (Pecora Paint Company) contracted silicosis which caused him to be totally disabled on and after January 8, 1938 and which resulted in his death from silicosis at the Philadelphia General Hospital on August 31, 1938; (4) that from all the evidence in the case, and particularly the medical evidence of both sides which is not in conflict, Lawrence Wilbert contracted silicosis while working in the employ of the defendant at a time more than five years preceding his disability and subsequent death; that he was disabled only after an exposure of five or more years; (5) that the claimant is the lawful and legal widow of the decedent, and was living with him and totally dependent upon him for her support at the time of his death."

Corresponding conclusions of law followed and compensation was awarded as follows: The American Mutual Liability Insurance Company and the Second Injury Reserve Account as aforesaid were ordered to pay claimant compensation "in accordance with their responsibility under the provisions of the Act" at the rate of $18 per week for total disability of the decedent during his lifetime from January 8, 1938 to August 31, 1938, a period of 33-5/7 weeks, or the sum of $606.86; "and then, said defendant, and/or its insurance carrier and the Second Injury Reserve Account in the State Workmen's Insurance Fund are ordered and directed to pay to the claimant as wholly dependent

widow of the decedent, compensation at the rate of $12 per week for a period of 466-2/7 weeks, the balance of the 500 weeks period provided by the Act, and thereafter compensation at the rate of $5 per week until such time as the claimant dies or remarries. Together with interest at the rate of 6% per annum on the amounts of compensation due at the time the first payment has been actually made. And the defendants are ordered and directed to pay to the claimant $200 on account of the burial expenses of the decedent."

Appeals were filed by the Second Injury Reserve Account from the referee's fourth finding of fact and second conclusion of law and the award, and by the employer and its insurance carrier from the fifth finding of fact and the third conclusion of law and the award.

The Board dismissed the appeals and affirmed the referee's findings of fact, conclusions of law and award, and "For the sake of clarity" added to finding of fact 5, "5A.: The claimant was married in 1900 to a man named Kearney, who died in 1929. Shortly after his death, the claimant, who prior to that time had acted as decedent's housekeeper, and the deceased employee went through the ceremony of a common law marriage." Separate appeals to the court of common pleas were taken by the Commonwealth of Pennsylvania, Second Injury Reserve Account and the employer and its insurance carrier, which were dismissed, and the award sustained and judgment entered in favor of the claimant accordingly. Appeals were taken to this court by the Commonwealth of Pennsylvania, Second Injury Reserve Account (No. 176), and by the employer and its insurance carrier (No. 187).

All objections to the claim and award raised before the referee and the board are here waived except the two following questions: (1) The one, by the employer, Whether the testimony in the record supports the fifth finding of fact of the referee, as amended by the board? to wit:

"5. That the claimant is the lawful and legal widow of the decedent, and was living with him and totally dependent upon him for her support at the time of his death; that there are no other dependents.

"5A. The claimant was married in 1900 to a man named Kearney, who died in 1929. Shortly after his death, the claimant, who prior to that time had acted as the decedent's housekeeper, and the deceased employee went through the ceremony of a common law marriage."

(2) The other, by the State Workmen's Insurance Fund, as custodian aforesaid, Whether the limitation of the total liability of the employer for silicosis, anthraco-silicosis, or asbestosis, to $3600 in section 5(b) is applicable to the compensation payable for those occupational diseases *jointly by the Commonwealth and the employer* according to a sliding scale, under section 7(a), where the board shall determine that they have developed to the point of disablement only after an exposure of five or more years, or does not apply to the payments directed to be made by the Commonwealth out of the Second Injury Reserve Fund?

As we are of opinion that the first question must be decided adversely to the claimant, we are not required to pass upon the second. Our failure to do so is not to be regarded as either an affirmance or disaffirmance of the ruling of the board and the court below upon it.

Coming then to the question of the claimant's marriage with the deceased employee, there was sufficient evidence of reputation and cohabitation to support a finding that they had been married. There was none at all to support a finding that they were married on September 9, 1912 at Wilmington, Delaware, as the claimant had sworn in her claim petition. But she proved by the deceased employee's sister, Mrs. Effie Dorn, and by his brother, Luther Wilbert, among others, that they had lived together as man and wife and been

recognized as such for more than ten years before his death. Mrs. Dorn said she had known the claimant for fifteen or twenty years; that she (claimant) went to live in her brother Lawrence's house about ten years before; that after claimant went to live with her brother, the witness knew her as his wife—*"That is all I ever knew her as; as his wife"*, she said; and that she did not know her as his wife until she went to live in his house. To the question, "You do not know how long they lived together at the present address [2452 Leithgow Street] before he introduced you to her as his wife?" she answered, "I would say they lived there ten years." The referee then asked her, "As far as you were concerned you thought it was a legitimate marriage performed in the usual way by a religious or civil ceremony" she replied, "I certainly did; I always thought they were man and wife."

The brother, Luther Wilbert, testified that he had visited his brother Lawrence and the claimant frequently since 1927 at 2452 N. Leithgow Street, and that the first time he had gone there his brother had introduced claimant to him as his wife. Later he said it was ten or eleven years ago—that is, ten or eleven years before December 1938, which would make it 1927 or 1928.

Claimant was not satisfied to let her proof of the marriage rest on reputation and cohabitation. She herself took the stand and testified to a common law marriage which took place between her and Lawrence Wilbert about September 9, 1923, in which, in words of the present tense, they agreed then and there to marry and become husband and wife. They then went to housekeeping and lived together as man and wife at 2452 N. Leithgow Street for fifteen years, until he died.

She gave full details of the matter,—she had been going with Mr. Wilbert for about ten years, and then they decided to live together and get married, but she

said, "on account of our religion—he is a Protestant and I am a Catholic—we cannot be married in the Catholic Church, and he said, if you want to, if it is right with you, let us be married this way and we agreed to live together as man and wife" and again, "We said we are going to live together as man and wife because we could not be married in the Catholic Church, so we kept on putting it off until finally we did it this way." "Q. [by Mr. Stiefel, attorney for claimant] Did Wilbert say anything to you *when you went to live with him?* A. He said he married me and I said all right and I said on account of the Catholic religion we cannot be called out and go in the Catholic Church and finally he said all right if you want to live as my wife, let us live together as man and wife and we decided to live that way.

"Q. Did you say it would be all right for him to be your husband?

"A. Yes sir, I said you are my husband and I am your wife. ......

"Q. [Still by Mr. Stiefel, her attorney] And then did you go to housekeeping?

"A. Then we went to housekeeping.

"Q. Where did you live together as man and wife?

"A. 2452 North Leithgow Street.

"Q. For how long?

"A. Fifteen years.

"Q. Until what time?

"A. Until he died."

There was thus clear and definite evidence by the claimant, *elicited on direct examination by her own counsel,* that on or about September 9, 1923, she and the deceased employee entered into a common law marriage, in words of the present tense, for the purpose of establishing the relation of husband and wife; that she then lived with him as his wife at 2452 North Leithgow

Street and continued to do so for fifteen years until his death.

On cross-examination, she was somewhat uncertain as to whether she had lived with Wilbert, prior to the common law marriage as testified to by her, and she also stated, in substance, that she had hoped and expected to follow the common law marriage by a ceremonial marriage down to the date of Wilbert's death, but they had never done so, and that there had been no subsequent change in their marriage status. And then, evidently to the surprise of her own counsel, it was brought out that at the time when she and Wilbert went through this common law marriage she was already a married woman; that her husband, William Kearney, was then living in Philadelphia, and that they had not been divorced; that she was married to Kearney in 1900, and had left him about 1910 because of his failure to support her, she taking one child and her husband keeping the other; and that her husband died in Philadelphia in 1929. The testimony also leans to the view that Wilbert knew that she had a husband living when she came to live with him; and this, probably, rather than the difference in their religion, was the reason for their resorting to a common law marriage, instead of having a ceremonial marriage, after procuring a marriage license, in the course of which inquiries would have been made as to prior marriages, etc.

Of course, it follows that with a husband living, from whom she had not been divorced, the claimant could not lawfully marry Wilbert either by a ceremonial wedding or a common law marriage; and to validate the relation it would require affirmative action after the death of her husband, Kearney, either in the way of a ceremonial wedding or a new agreement of common law marriage: *Hantz v. Sealy*, 6 Binney 405; *Murdock's Est.*, 92 Pa. Superior Ct. 275; *Estate of*

*Mary F. Hughes,* 98 Pa. Superior Ct. 328; *Fitzpatrick v. Miller,* 129 Pa. Superior Ct. 324, 196 A. 83. But the claimant had testified positively that after her common law marriage in 1923 there had been no further contract of marriage or change in her marriage relations. Without it, a mere continuance of their former relations after Kearney's death would not constitute a valid marriage: *Fitzpatrick v. Miller,* supra; *Estate of Mary F. Hughes,* supra; *McLaughlin's Est.,* 314 Pa. 574, 172 A. 107. As the claimant knew when she entered into the alleged common law marriage with Wilbert that her husband, Kearney, was living and not divorced, her relationship with Wilbert was meretricious and remained so, in the absence of a change of status: *Cline's Est.,* 128 Pa. Superior Ct. 309, 194 A. 222.

On re-direct examination by her counsel, Mr. Stiefel, she then testified:

"Q. When you went to live with Mr. Wilbert, in what capacity did you go there in 1923?

"A. As his wife. We just lived there. He had the home and I went there to live with him and be married.

"Q. When was that?

"A. 1923.

"Q. While your husband was living, did you live with Mr. Wilbert?"

"A. Yes, I did.

"Q. Did you live with him as man and wife during that time?

"A. No.

"Q. While your husband was living, what did you do in Mr. Wilbert's home?

"A. I lived with him in his house.

"Q. What did you do in the house?

"A. As his housekeeper.

"Q. When did you come to Mr. Wilbert's house?

"A. 1923.

"Q. How many years did you live with Mr. Wilbert as man and wife?

"A. Fifteen years."

In an attempt to escape from the situation in which her own testimony and that of her prior witnesses had placed her, the claimant called a near neighbor, Mrs. Elizabeth Smith, and later took the stand again herself.

Mrs. Smith's testimony was not very helpful, for it was mostly merely hearsay, not in accord with the testimony of claimant's prior witnesses. She said she knew the Wilberts from the time they first moved to Leithgow Street, about twenty years before; that when they first came there the claimant was housekeeper for Wilbert; that about ten years *ago* [that is ten years before December 1938] they told her they were married; that in 1923, her own husband was railroading at night and she, the witness, spent a good many nights sleeping in the back room with the claimant, who was Wilbert's housekeeper, while Wilbert slept in the front room; that, subsequently, in response to a telephone message from one of claimant's sons, she had notified claimant that her husband, William Kearney, was dead and after that claimant became known to her as Mrs. Wilbert; that this occurred about ten years *ago*—that she had moved away from the neighborhood eight years *ago*. Her testimony that Wilbert and claimant were not known by her as husband and wife until after she received word of Kearney's death, could not be used by claimant to refute the evidence of her own witnesses who testified that they had been generally known as such and that Wilbert had introduced claimant to them as his wife before 1929. Nor could it refute the claimant's definite and detailed testimony as to the common law marriage in 1923, and her living with Wilbert as his wife for fifteen years, until his death in 1938.

The claimant then took the stand, after an absence of forty minutes, and testified that she had moved to 2452 Leithgow Street about twenty years before, and had been Wilbert's housekeeper until Mr. Kearney died and then she had gone through the common law marriage with Wilbert. She admitted that she had told the young woman who filled up the claim blank that she had been married to Wilbert in 1912 at Wilmington, Delaware, and had sworn to the same. She gave no adequate explanation of her prior testimony about the marriage in 1923 and of her living with Wilbert as his wife for fifteen years.

Her testimony was only a *general* contradiction of the details which she had so circumstantially narrated as to her married life with Wilbert for fifteen years since 1923, and of how they came to go through with the common law marriage. No court, in a common law action, would allow the verdict of a jury based upon such testimony to stand; and while we recognize that the Workmen's Compensation Board is the fact finding tribunal under the Workmen's Compensation Law, yet since the opinion of Mr. Justice STONE, speaking for the Supreme Court of the United States in *National Labor Relations Board v. Columbian Enameling and Stamping Co.,* 306 U. S. 292 (1939) it has been generally recognized by the courts, including this court, that when a statute declares that the findings of fact of an administrative board, if supported by evidence, shall be conclusive, it means evidence that is substantial—that is, evidence affording a substantial basis of fact from which the fact in issue can reasonably be inferred. As was said by Mr. Justice STONE, "Substantial evidence is more than a scintilla and must do more than create a suspicion of the existence of the fact to be established. 'It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion', *Consolidated Edison Co. v. National Labor*

*Relations Board,* supra [305 U. S. 197], p. 229, and it must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." To suffer this general statement of the claimant to overcome all her previous testimony, given at a time when there was no apparent reason for testifying falsely, would be to invite perjury and false testimony.

It is too clear for argument that the claimant's change in her testimony was an afterthought, designed to escape the legal results following the discovery that she was a married woman with a husband living in the same city, and not divorced, at the time she went through the form of a common law marriage with Wilbert. There was no confusion as respects the date of her common law marriage to Wilbert and the number of years they had lived together as man and wife until, forty minutes after her cross-examination, she injected it into the case in an endeavor to escape the legal consequences of her being a married woman when she started living with Wilbert as his wife. It must be borne in mind that the details of the common law marriage and its duration for fifteen years, until Wilbert's death, were all first brought out by claimant's counsel on her direct examination.

We are of opinion that the claimant's attempted denial of her own detailed testimony did not measure up to the *substantial* evidence necessary to support the board's findings of fact 5 and 5A and that her claim as Wilbert's dependent widow must be denied.

The judgment is accordingly reversed as to the award in favor of the claimant as dependent widow of Lawrence Wilbert, and the award in her favor, as such widow, is set aside. The judgment as respects the award of $606.86, for compensation for total disability to Lawrence Wilbert during his lifetime, from January 8, 1938 to August 31, 1938, and of $200 on account of

50

his funeral expenses, is modified so as to be payable to his personal representative. Act of April 13, 1927, P. L. 186, sec. 5, p. 194; Act of June 26, 1919, P. L. 642, 648. Interest will acrue from the respective dates the compensation, etc. should have been paid.