Opinion by
 

 Cunningham, J.,
 

 On November 16, 1937, the employee and employer in this workmen’s compensation case entered into an open agreement for the payment by the latter to the former of compensation for total disability due to an accidental injury sustained by him, November 4th, in the course of his employment. The description of the accident read: “Walking across room, fell over rail. Bruise of left knee.” Under this agreement payments were made until May 15,1939— a period of 78-4/7 weeks and in the total amount of $1178.45. On that date the employer, Ford Collieries Company, filed its petition for termination of the agreement, alleging that all disability of its employee, Louis Metalko, attributable to the accident had ceased and he was able to return to work. Attached to the petition was the affidavit of Dr. E. W. Cross to that effect, as required by the second paragraph of Section 413 of the Workmen’s Compensation Act of June 4, 1937, P. L. 1552, 77 PS §774. Metalko answered he “still [had] trouble with his knee” and was unable to work.
 

 At the hearing before the referee, the employer, having the burden of proof, called two physicians; the employee did not take the stand himself but called one medical expert.
 

 The controlling finding of the referee reads: “Fifth: From the preponderance of the evidence produced at the hearing and observation of the claimant, your referee finds as a fact that all disability, resulting from the injuries sustained by accident by the claimant, while
 
 *208
 
 in the course of Ms employment with the defendant on November 4, 1937, ceased on April 15, 1939, at which time claimant was able to resume his former employment.” Based upon this finding, the referee concluded “as a matter of law that the defendant [was] entitled to termination as prayed for” and, on February 16, 1940, filed an order terminating the agreement “as of April 15, 1939.”
 

 The board affirmed the action of the referee; the court below dismissed the employee’s appeal and entered judgment in favor of the employer; hence, the present appeal by Metálico.
 

 The only question of law here involved is whether the appellee-employer adduced competent and substantial evidence
 
 (Wilbert v. Com. Sec. Reserve Acc. et al.,
 
 143 Pa. Superior Ct. 37, 48, 17 A. 2d 732) or, in the language of the Workmen’s Compensation Act of June 21, 1939, P. L. 520, 77 PS §834, “sufficient competent evidence” to justify the finding of fact above quoted. We are satisfied it did.
 

 Dr. J. F. Jose, the company doctor who attended appellant at the time of the accident and maintained a general professional supervision over him, testified appellant gave him a history of falling while walking out of the mine and striking his left knee on the rail; that he diagnosed the injury as a “contusion of the knee— possibly discoloring the periosteum, but not disabling, because [he] could not elicit any crepitation or fluctuation of the knee”; and that he estimated appellant’s disability at about a week and gave him physiotherapy treatments.
 

 As appellant continued to complain of pain, although the movements of his leg seemed normal, the witness called at his house a number of times to observe his conduct there and also saw him frequently on the street. After stating he had treated appellant several times for delirium tremens, Dr. Jose continued: “I would drop in to see him and when asking him how
 
 *209
 
 he was, how his knee was, it was always bad and he never could see any future satisfactory recovery of this knee. I would sit down and have a little talk with him and talk about several things in general and on several occasions he showed me tricks that his pet cat would do. He would jump up and retrieve this cat, even though it had been under the bed on several occasions. Several times I have seen him walking along the street with apparently no disabling walk. I, on two occasions, stopped and talked with him and after I talked with him his knee was always worse and he always left me, walking very disabled. Q. Could you state any specific instances or various times in which you saw 'him? A. I saw him in Tarentum, crossing the street in front of my car. I had to stop my car to allow him to cross the street. He didn’t see me. Q. Any indications of disability or limping at that time? A. He was running across the street, not running but hurrying across the street in front of moving traffic. Q. From your observation of him and examination, state your professional opinion as to whether or not he suffers any industrial disability at this time? A. I believe not.”
 

 Late in 1937, when Dr. Jose thought appellant “was dragging out an insignificant injury” by complaining of pain, he referred him to Dr. E. W. Cross at Tarentum for X-rays. Dr. Jose last saw appellant, prior to the 'hearing in February, 1940, in the fall of 1939 when he “treated him for delirium tremens” at which time he was “practically stuporous for two days.”
 

 Dr. Cross testified the X-rays showed “no pathology or suppuration,” but he then thought appellant “had some unusual strain of the lateral ligaments.” Referring to his efforts to treat appellant, the witness said: “I applied a very light plaster cast to the knee, extending eight inches above and the same distance below the knee. That was done on the evening of December 29, 1937. He went home and began drinking and came to my office later that night, having cut the cast partly
 
 *210
 
 off himself and demanded the removal of it, which I was compelled to do. I supplied him with an elastic knee support; I cut out a circular piece of felt, which was used beneath the knee support on the inner side.”
 

 As to his experiences with appellant during 1938 and the early part of 1939, the witness testified: “I saw him at frequent intervals and I could get no cooperation from him whatsoever. He had been given physiotherapy and infra-red baking, but he continued to complain of this soreness.......He was always under the influence of liquor and rn two occasions, he had, when I saw him, delirium tremens. In one of these spells, he was so violent that he fought imaginary foes and in falling in his room, cut his face. I saw him on the street on several occasions......, when he did not see me and he Avas walking without any appreciable limp whatsoever. I Avould try to get him at the office so that I could examine him carefully and he would merely rotate his knee and said it hurt him and he didn’t want anything done to it; that he Avas through; he was done forever and that he would not let me do anything to it. I tried to get him to go to the hospital for an X-ray treatment, because he complained of this pain, but I could get no opportunity to examine it, because he would drag his leg and cover it up with his hands. I ask[ed] him to even permit me to take him to an orthopedic surgeon, at which time he refused and became wildly excited.......In fact, I finally examined him carefully when I was able to divert his attention and I could elicit no abnormal motion in his leg. I could get no history of any locking of his knee; but he would point directly to the pain, Avhere he said it hurt him, which was not that of a dislocation of the semi-lunar cartilage. On
 
 April 15, 1939,
 
 [the date as of Which the referee found disability ceased] I again visited him. I purposely have this date. I found him under the influence of liquor and playing Avit'h his pet cat. I chased the cat under the bed. He hurriedly got
 
 *211
 
 down on Ms knees and grabbed under tbe bed and secured the cat and fondled it. When he realized what he had done, then he started to complain of his knee and would go through all kinds of motions.
 
 Even then I could not find any evidence of disability.
 
 At least on two occasions I ask[ed] him to go to the hospital or to anyone he might wish for further examination, consultation or treatment, as regards this knee at which time I met with strong refusal.
 
 On the last occasion,
 
 after appealing with him from every standpoint,
 
 he finally ashed for two more months’ disability, when he would go to worh, but he refused any treatment.”
 
 (Italics supplied.)
 

 The professional opinion of Dr. Cross was thus expressed : “Q. Doctor from your observation of him over a period of time state your professional opinion as to whether or not he has any industrial disability in this knee? A. Frankly, I could at no time get sufficient cooperation from him that I could intelligently make any further deductions than what had been originally made, the X-rays showing no bone displacement, no separation beyond normal of the joint surface and no history of locking. I concluded that this was largely a case of malingering, because I was not able to detect anything definite, because I was never able to completely and thoroughly make an examination of this man.”
 

 Dr. J. M. Snyder, called by appellant, never examined him until August 19, 1939, but expressed the opinion, based upon the history given him by appellant, that he was suffering from a damaged semi-lunar cartilage, which may have been aggravated by his falls While intoxicated.
 

 To the extent that Dr. Snyder’s opinion differs from the opinions of the company’s experts, it was within the exclusive province of the compensation authorities to decide which they would adopt.
 

 In declining to disturb the conclusion of the referee
 
 *212
 
 that appellant is a malingerer, Chairman Murphy, speaking for the board, pertinently remarked: “In view of the testimony of Dr. Cross and Dr. Jose, it is especially significant that claimant did not testify in his own behalf either as to his present physical condition or to deny the statements of the defendant’s witnesses.”
 

 From the foregoing review of the record it is clear there is evidence in this case, of the required quality and quantity, justifying the findings of fact of the compensation authorities upon which their termination of the agreement was based.
 

 Judgment affirmed.