Jamison et al. *v.* Williams, Appellant.

Argued November 10, 1948. Before RHODES, P. J., HIRT, RENO, DITHRICH, ROSS, ARNOLD and FINE, JJ.

reargument refused April 4, 1949.

*Harry Diamond*, with him *J. I. Simon*, for appellant.

*Thomas E. Barton*, with him *Oliver L. Johnson*, for appellees.

OPINION BY FINE, J., March 15, 1949:

This is an appeal from the order of the court below discharging rule to open judgment amicably entered August 5, 1947, on lease to premises at 621 Hollace Street, Pittsburgh. The lessor, George Boyd, died on April 18, 1946, leaving a will in which he devised the said premises to the appellees, Annie Jamison and Martha Tyson. At the time of Boyd's death, the appellant, Laura Williams, occupied the premises and has since continued her occupancy asserting she and two children,

claimed by her to be sons of the decedent, own the premises by reason of a common law marriage between her and Boyd.

Depositions taken on the petition and answer reveal that the appellant and Boyd first met in January, 1932. The husband of Laura Williams died in 1930 and the wife of Boyd died during 1932 (apparently during January). In February, 1932, Boyd started to take his meals at the boarding home of the appellant, and this practice brought him into daily contact with her. Soon thereafter they went out socially as often as twice each week. According to appellant's testimony the following conversation took place in March, 1932, between her and Boyd: "A. . . . he asked me would I be his wife and made a vow that he would do the best he could for me. Q. And what did you say to him? A. I told him yes, I would. Q. What else did he say, if anything? A. Then he asked me could he stay that night and continue to stay and live as man and wife, *until the time that we could be married.* (Italics supplied.) Q. And what did you say to that? A. I told him yes." On cross-examination, she was asked: "Q. Was that the understanding. The understanding was someday you would be married. A. That's correct. Q. But that day never came? A. Some how it didn't." Counsel for appellant earnestly contends that the language of the parties constituted an agreement to marry in the present tense which, followed by cohabitation and reputation as husband and wife, establishes a valid common law marriage: *Brown v. Nolen*, 298 Pa. 384, 148 A. 498. Such construction ignores the clearly expressed intention of the parties in this case to consummate a marriage at some unspecified future time.

"When it is attempted to establish marriage without the usual formalities, we should examine the professed contract with great scrutiny, and be entirely satisfied this solemn undertaking has been entered into by the voluntary assent of both parties . . . [and] . . . when

the lips of a man are sealed by death, and he leaves no satisfactory evidence as to the existence of such contract, courts will be very slow to establish it in derogation of the undoubted rights of those who follow him": *Stevenson's Estate*, 272 Pa. 291, 296, 301, 116 A. 162. See, also, *Krystkiewicz's Estate*, 310 Pa. 298, 300, 165 A. 230; *Osterling's Estate*, 323 Pa. 23, 28, 185 A. 790.

Appellant admitted that she was known as Laura Williams to some people and Laura Boyd by others; that she gave the name of Williams to the two sons she claimed to be the children of George Boyd; that as Laura Williams she signed a lease, as lessee, for the litigated premises, owned by Boyd, and jointly occupied, at times, by him and the appellant; that her name appeared in the city directory as Laura Williams from 1934 to 1945; that she registered in the same name at Magee Hospital in 1932 and at Mayview Hospital in 1939; that she bought goods and merchandise in the name of Williams; that she signed as Laura Williams an affidavit for the coroner at the time of Boyd's death in April, 1946, in which affidavit she admitted she was the lessee of his house; that she filed a caveat in the Register of Wills office as Laura Williams; and that she maintained two homes for some time; one for the two boys by a previous marriage and the other for the children claimed to be the offspring of Boyd.

If the parties intended to live together as husband and wife, which fact considering her admissions we seriously question, their marriage was nevertheless in contemplation; it was not consummated. The words used by the parties denoted an engagement to marry at some future time, not the consummation of a present marriage. Where she herself proves, as here, that no valid marriage contract was actually entered into between her and the decedent, evidence of cohabitation and reputation has no probative value: *Tholey's Appeal*, 93 Pa. 36, 38; *Hunt's Appeal*, 86 Pa. 294, 296; *Patterson's Estate*.

237 Pa. 24, 28, 85 A. 75; *Grimm's Estate*, 131 Pa. 199, 202, 18 A. 1061; *Bisbing's Estate*, 266 Pa. 529, 109 A. 670; *Murdock's Estate*, 92 Pa. Superior Ct. 275. "Cohabitation and reputation that the parties are married do not constitute a legal marriage—not even a common-law marriage—but they are evidence from which a marriage may be found, if the circumstances are sufficiently strong and convincing to satisfy the triers of fact. If, however, the alleged widow is not satisfied to rest her case on reputation and cohabitation[1] and attempts to prove the marriage by evidence of what occurred at the time of the alleged contract of marriage, and the evidence establishes that no marriage took place, the presumption arising from reputation and cohabitation, no matter how strong, must give way to the positive proof that no contract was made": *Caddy v. Johnstown Firemen's Relief Association*, 129 Pa. Superior Ct. 493, 495, 196 A. 590.

There is an abundance of authority that the evidence of cohabitation and reputation is valueless where claimant herself proves no actual marriage exists. In *Murdock's Estate*, 92 Pa. Superior Ct. 275, 277, we said: "Notwithstanding the divergent testimony, there was probably sufficient evidence, if believed, to sustain a presumption and a consequent finding that the parties were married, if the evidence had been confined to cohabitation and reputation. But the claimant testified to the precise form of the contract of marriage between her and the decedent, and by this she must stand or fall. If the alleged conversation constitutes a contract of marriage, evidence of cohabitation and reputation is re-

---

[1] Where claimant is available to testify to the form of the alleged marriage contract and fails to do so, it may properly be assumed that no contract was entered into. Rule basing common law marriage on cohabitation and reputation alone is one of necessity to be applied where other proof is not available: *Nikitka's Estate*, 346 Pa. 63, 29 A. 2d 521.

ceived in corroboration of her testimony that a marriage contract was in fact entered into. But if she herself proves that no valid marriage contract was actually entered into between them, evidence as to cohabitation and reputation goes for nothing. (Citing cases.)" This rule has been reiterated quite recently by the Supreme Court in *Pierce v. Pierce*, 355 Pa. 175, 180, 49 A. 2d 346, where the Court said, in an opinion by Justice PATTERSON: "Where a common law marriage is asserted, any presumption which might otherwise be indulged in, becomes immaterial when the one asserting the validity of the relationship relies upon a putative contract which is legally insufficient to establish the fact of marriage. See McDevitt's Estate, 280 Pa. 50, 52, 124 A. 294, 295; Bisbing's Estate, 266 Pa. 529, 531, 109 A. 670, 671."

The question here is not whether these parties were engaged but whether they were married, and of the latter status there was not sufficient proof. The mere living together in the ostensible relation of husband and wife does not constitute marriage. There must be a mutual agreement to become husband and wife, which contract may be proved like other contracts. However the law, of necessity, imposes a heavy burden on one who bases a claim on an allegation of a common law marriage, for as said by President Judge KELLER in *Baker v. Mitchell*, 143 Pa. Superior Ct. 50, 54, 17 A. 2d 738: ". . . [common law marriages] are a fruitful source of perjury and fraud, and, in consequence, they are to be tolerated, not encouraged; the professed contract should be examined with great scrutiny, and it should plainly appear that there was an actual agreement entered into, then and there, to form the legal relation of husband and wife. . . ."

To hold a common law marital status was created, in light of the record before us, would give to the uncontradicted declarations and admissions of the claimant a meaning and intention they certainly do not express or

350

convey. We have carefully examined all the evidence, as did the court below, and we find no error was committed in discharging appellant's rule to open.

Affirmed.