## Rager *v.* Johnstown Traction Company et al., Appellants.

Argued April 10. 1957. Before RHODES, P. J., HIRT, GUNTHER, WRIGHT, WOODSIDE, ERVIN, and WATKINS, JJ.

476

*Robert J. Wharton,* with him *Edward J. Harkins* and *Harkins & Wharton,* for appellants.

*Edward F. Peduzzi,* with him *Paul E. Beaver* and *Harry B. Hogemyer,* for appellee.

OPINION BY ERVIN, J., October 2, 1957:

In this workmen's compensation case, Ira H. Rager was accidentally killed September 22, 1953 while in the course of his employment with the defendant company and Margaret Rager claimed compensation as his widow. The only question involved is whether there was a valid common law marriage. The referee and board found that there was a valid common law marriage and awarded compensation to the claimant. The lower court dismissed the defendant's appeal and entered judgment affirming the award of compensation. The defendant and its insurance carrier took this appeal.

The law in this field is clear and well established. As the fact finding body has found in her favor, we must review the evidence in the light most favorable to the claimant and she is to be given the benefit of inferences reasonably deducible therefrom. *Fiedler v.*

*National Tube Co.,* 161 Pa. Superior Ct. 155, 159, 53 A. 2d 821. Common law marriages are valid in Pennsylvania. *Buradus v. General Cement Products Co. et al.,* 159 Pa. Superior Ct. 501, 48 A. 2d 883, affirmed 356 Pa. 349, 52 A. 2d 205. Marriage in Pennsylvania is a civil contract and does not require any particular form of solemnization before officers of church or state. *Balanti v. Stineman Coal & Coke Co.,* 131 Pa. Superior Ct. 344, 200 A. 236; *Wagner v. Wagner,* 152 Pa. Superior Ct. 4, 30 A. 2d 659.

Cohabitation and reputation that the parties are married do not constitute a legal marriage—not even a common law marriage—but they are evidence from which a marriage may be found, if the circumstances are sufficiently strong and convincing to satisfy the triers of fact. *Caddy v. Firemen's Relief Assn.,* 129 Pa. Superior Ct. 493, 196 A. 590; *Jamison v. Williams,* 164 Pa. Superior Ct. 344, 348, 64 A. 2d 857. To constitute a valid marriage in Pennsylvania there must be a contract *per verba de praesenti,* uttered with a view to establish the relation of husband and wife. *Murdock's Estate,* 92 Pa. Superior Ct. 275, 285. The presumption of a valid common law marriage which arises as a result of cohabitation and reputation may be rebutted by proof that no common law marriage had in fact taken place. *Edwards v. Enterprise Mfg. Co.,* 283 Pa. 420, 421, 129 A. 449. Where the one who asserts a common law marriage does not rest her case on reputation and cohabitation but attempts to prove the marriage by evidence of what occurred at the time of the alleged contract of marriage, presumption of marriage arising from reputation and cohabitation will give way to positive proof that no contract was made. *Fiedler v. National Tube Co.,* supra, at page 158. Evidence of cohabitation and reputation may be received and considered in corroboration of testimony that a marriage

contract was in fact entered into. *Com. ex rel. Kolish v. Kolish,* 154 Pa. Superior Ct. 591, 593, 36 A. 2d 857.

The difficulty in this case is not with the law but with the facts and the inferences to be drawn therefrom. There was ample evidence of cohabitation and reputation to establish a presumption of a valid common law marriage contract. The parties continuously lived together for approximately 11 years as man and wife and this association was terminated only by the death of the man. Both of the parties were free to enter into a valid contract at the time they started living together, the man being a widower and the woman being single. Store accounts and charge plate were made out in the names of Mr. and Mrs. Ira H. Rager; insurance contracts were made out in their names as man and wife; the decedent always introduced her as his wife; their friends knew them as Mr. and Mrs. Rager and a number of them so testified; they received many letters and Christmas cards addressed to Mr. and Mrs. Ira Rager and Mr. and Mrs. Ira H. Rager; a son of the decedent by a former marriage wrote a letter to them calling them "Mom and Pop"; they made loans from a loan company in the names of both as man and wife; and this status continued for the last 11 years of the decedent's life. It is argued, however, that the presumption of a valid common law marriage, which clearly arises from cohabitation and reputation, is destroyed by evidence given by the claimant as to the actual contract. This is the crux of the case. If she clearly testified that there was no contract, then her claim would fall. We do not believe that she so testified. The essential part of her direct examination is as follows: "Q. Now how did you happen to go there? A. Well, he seen me and he asked, he said, 'Come and live with me and make a home.' I had no place to stay, no place to go, I had to do something, so I did, so we lived up there

a year or two years till, I told him until we find a better place, because I wasn't satisfied with that place. . . . Q. I think my question may not have been entirely clear. What I wanted to know was whether you and Mr. Rager had any understanding or agreement of any kind before you went to live with him? A. *Sure. To be husband and wife, that's the way we made it out, as long as he lived and as long as I lived. Everything went on Mr. and Mrs. R. H. Rager.* . . . Q. And did you continue living together until the time of Mr. Rager's death? A. Yes. Q. And what was the date of his death? A. September 22nd. Q. 19—? A. 1953. . . . Q. From 1943 until the date of Mr. Rager's death you continued living at the address mentioned a moment ago? A. Yes, I am. Q. And under the same circumstances which you told us just a while ago? A. Yes. . . . Q. By whom were you supported? A. By Mr. Rager, my husband." (Emphasis added) Her relevant cross-examination is as follows: "Q. You stated when you first went to live with Ira Rager in 1941 or 1942, he said to you, 'Come and live with me and make a home.' Is that right? A. Yes. Q. Now is that the only statement that was made at that time about you and he living together? A. Yes. . . . Q. Do you remember telling Mr. Rickert that there was no ceremony or oral agreement between you and Ira Rager? A. *Yes, it was, I told him that, because my husband always said, 'Between the eyes of God we are husband and wife.'* . . . Q. In other words, your position is that you had no agreement or conversation between you and your husband other than the original statements that were made back when you went to Ferndale, 'Come and live with me and make a home,' other than the fact that he said that in the eyes of God, why you were his wife, is that correct? A. Yes. Q. You never had any agreement that you would be married? A. No. I thought that

was enough. He was willing to make a home for me, I was willing to go with him. I think that ought to explain enough. Q. Well, in other words then, he needed a home, and you needed a home, and the two of you started to live together? A. Yes. Q. And the only agreement you ever made was when you started, he said, 'Come and live with me and make a home,' is that right? A. Yes. Q. You never made any other agreement after that? A. To live together until either one of us died, just depends. Q. Then after that you continued to live with Ira Rager until his death on September 22nd, 1953? A. Yes. . . ." (Emphasis added)

The claimant, in some of her testimony, was endeavoring to give the language used by the parties and in some of it she was giving her conclusion as to the meaning of that language. Taken as a whole, we believe that it meant that the parties intended to live with each other as man and wife until death did them part. It certainly does not mean that there was no contract at all or that they were living together in a meretricious relationship. The cohabitation and reputation evidence corroborates an agreement to live together as man and wife and it is not evidence of a meretricious relationship. President Judge IVAN J. McKENRICK, in an opinion concurred in by Judge GEORGE GRIFFITH, carefully analyzed the testimony and we believe his analysis to be correct. He said, "It is contended on the part of the defendant here that since the claimant relied upon certain words spoken by the decedent that the burden of proving a common law marriage was not sustained by the claimant, and that the evidence of cohabitation and reputation was, therefore, of no avail to sustain the alleged common law marriage.

"The case of Caddy v. Johnstown Firemen's Relief Association of the State of Pennsylvania, 129 Pa. Superior Ct. 493, 495, is cited, as follows: 'Cohabitation

and reputation that the parties are married do not constitute a legal marriage—not even a common law marriage—but they are evidence from which a marriage may be found, if the circumstances are sufficiently strong and convincing to satisfy the triers of fact. If, however, the alleged widow is not satisfied to rest her case on reputation and cohabitation and attempts to prove the marriage by evidence of what occurred at the time of the alleged contract of marriage, and the evidence establishes that no marriage took place, the presumption arising from reputation and cohabitation, no matter how strong, must give way to the positive proof that no contract was made:' citing certain cases.

"We are quite familiar with the principle laid down by all the cases, including the Caddy case, above quoted. The Caddy case was tried in this court, the jury returned a verdict in favor of the plaintiff, and an appeal to the Superior Court resulted in an affirmance. The immediate question, then, is whether the words used by the decedent, according to the version given by the claimant, were sufficiently in praesenti to meet the requirements of the law.

"In the present case the decedent and the claimant were both free to marry. Decedent was a widower; claimant was a single woman. They kept company for some considerable time and there is not a word in the testimony to indicate that their relations were other than honorable during the period of courtship. Decedent had a home. Claimant was employed. On a date which she cannot recollect exactly, the decedent said to her 'Come and live with me and make a home'. We are fully warranted, from the testimony, in saying that the claimant is an unlettered person. Her language and grammar indicate that she was not schooled in the art of expression of her thoughts. However, in taking her testimony in its entirety, we must remember that

the interpretation of language, the use of words, the implications, the connotations, are all to be determined by the triers of fact. It is exclusively for the triers to determine from the language used what the speaker has in mind and is attempting to convey to his hearers. When the claimant was asked in cross examination as to whether there was any agreement as to the status of the decedent and herself before she moved in with the decedent, her answer was 'Sure. To be husband and wife, that's the way we made it out, as long as he lived and as long as I lived. Everything went on Mr. and Mrs. R. H. Rager.' On cross examination, claimant was asked whether she remembered telling the defendant's investigator that there was no ceremony or oral agreement between her and the decedent. The answer clearly had reference to the fact that there was no ceremony of marriage, but there was an agreement between the parties. She replied, 'Yes, it was, I told him that, because my husband always said, "Between the eyes of God we are husband and wife." ' It is very evident from the awkward manner of expression that the claimant is not a scholar. What she meant clearly is 'In the eyes of God we are husband and wife'. She therefore meant that while she had not gone into any place, such as a church or magistrate's office to have a formal marriage ceremony performed, the understanding between her and the decedent was clearly that in coming with him to make a home she was acting as a wife and not as a mistress.

"The contention of the defendant is that the relationship between these persons was meretricious in its inception. There is not, in our opinion, a word in the testimony which shows any meretricious relationship. The mere fact that she may have desired a home, having no place to go, and the decedent likewise desiring to have someone make a home for him, does not imply

that she was merely a housekeeper, and possibly a mistress.

"The claimant, who is in this appeal represented by counsel, lays great emphasis on the statement of the decedent 'Come and live with me and make a home'. The word 'home' to the ordinary individual is understood to mean the abode of a husband and wife, of a family. Never is 'home' considered to mean a place for dishonorable motives or immoral conduct. 'Home' is defined in Webster's International Dictionary, 2d Edition, as 'One's own dwelling place; the house in which one lives; esp., the house in which one lives with his family; the habitual abode of one's family. The social unit formed by a family residing together in one dwelling'. Construed in this light, decedent's proposal to claimant to 'Come and live with me and make a home' certainly shows an intent to have claimant live with him, not in a meretricious relationship, but rather as his wife. If he had said 'I need a housekeeper', or 'some one to clean my house and prepare meals', the contention of the defendants might have some support. The triers in this proceeding had the right, when the word 'home' was used, to give that word its proper connotation. We think, therefore, that the Workmen's Compensation Board was fully warranted in its statement in the substituted ninth finding of fact, which reads: 'At the time the claimant and the decedent went to live together they expressly agreed with each other to be husband and wife in words of the present and in that way entered into a common-law contract of marriage, which said contract they maintained by cohabitation, reputation and living together until the time of the decedent's death.' "

Judge McKenrick then quoted from the opinion of the Workmen's Compensation Board as follows: "Caddy vs. Johnstown Firemen's Relief Association (129 Pa.

Super. 493) is cited by both parties. Except for a previous engagement between the Caddys and a ring which was used in the common-law ceremony, the case is much like the one before us and we think it supplies the answer to the present problem. The parallels are that the parties were free to marry; that before they entered into their bond they 'kept company' without proven stigma and that they finally agreed to the status they were assuming. As to the major point which has been raised, we feel that everything the present claimant said about the contract of marriage connotes the present. They agreed 'to be husband and wife' not by way of engagement or in contemplation of further steps in that direction looking to the future, but rather to settle the nature of their relationship at the moment in keeping with the circumstances in which they found themselves at that time. Certainly the invitation to 'come and live (together) and make a home' was proposal enough and the agreement to be husband and wife whether oral or written was express. It presupposes words of the present. Explaining the applicable law, the court in the Caddy case (supra) said: 'Unlettered persons frequently become confused in the use of tenses and it is difficult to get them to testify to the exact language used in a conversation, in words of the first and second person and using the present tense, rather than their understanding of its import, in words of the third person and using the past tense; . . .' "

In the present case there was no evidence that anything further was to be done with respect to the relationship.

While there are some contradictions in the claimant's testimony, its meaning and the inferences to be drawn therefrom were for the referee and the board. They concluded that there was a valid common law marriage. The lower court properly determined that

the facts and inferences therefrom, as drawn by the compensation authorities, were binding upon it if they were supported by competent evidence. The lower court found the evidence to be sufficient and with this conclusion the majority of this Court is in accord.

Judgment affirmed.

DISSENTING OPINION BY HIRT, J.:

The majority opinion in this case is disturbing.

Whether a marriage contract has been established is always a mixed question of law and of fact. And here, notwithstanding the findings of basic facts in favor of the claimant, we may not ignore our duty to scrutinize the evidence to determine whether the findings are supported by substantial evidence supplying all of the legal essentials of a valid common law marriage. *Baker v. Mitchell et al.*, 143 Pa. Superior Ct. 50, 17 A. 2d 738. Even in workmen's compensation cases there must be substantial credible testimony sufficient to satisfy a reasonable mind as adequate proof of a marriage at common law. *Buradus v. Gen. Cement Prod. Co.*, 159 Pa. Superior Ct. 501, 503, 48 A. 2d 883; *Wilbert v. Com. Sec. Reserve Acc.*, 143 Pa. Superior Ct. 37, 48, 17 A. 2d 732. Judged by these standards the proofs in this case are patently inadequate to support the award.

The effect of the majority opinion will be to demonstrate in a death case, the way to set up a common law marriage, however spurious, sufficient in law to serve as a basis for recovery under our Workmen's Compensation Law.

In the light of the actualities we will refer to the testimony on which the award must rest. Decedent's statement to the woman plaintiff: "Come and live with me and make a home" was not a proposal of marriage

but a request merely that she become his housekeeper in exchange for her keep. And this is indicated clearly by her acceptance of the offer, in this language: "I had no place to stay, no place to go, I had to do something, so I did . . ." By her response she indicated that there was no implication of intended marriage either in the offer or her acceptance. What was offered and accepted was a *place* of abode, a place of residence, a place in which to live, and perhaps of refuge, with no intention of entering into a family relationship by marriage. She also indicated this clearly when examined by the referee. To the question: ". . . by the time you went there his children were away? A. Yes. And none of them cared for him, that's the reason we got together, he had to have a home, had to have somebody to look after him as well as I did." Moreover, elsewhere in claimant's testimony of her response to decedent's offer she said that she first "told him he could go with my sister, because she didn't live very long, she had heart trouble. I says if anything happened to her, we would go together and make a home, so we did so." If the intention of the claimant and the decedent was anything more than to create the relationship of man and housekeeper the claimant would not have suggested her sister as a substitute; she would have accepted a proposal of marriage forthwith.

When the referee asked whether "you and Mr. Rager had any understanding or agreement of any kind before you went to live with him" she replied: "Sure. To be husband and wife, that's the way we made it out, as long as he lived and as long as I lived. Everything went on Mr. and Mrs. R. H. Rager." The majority opinion makes much of this testimony. At best however, this is the statement of a conclusion, wholly lacking in *words* essential to the creation of a common

law contract. In similar situations *Hantz v. Sealy*, 6 Binney 405, 408, is invariably referred to as a leading case containing principles which have been controlling down to the present day. In that case the woman believed herself married, but the marriage was void because the man had a wife living at the time. Subsequently after Sealy's legal wife divorced him, a lawyer advised the two to celebrate a marriage. Acting upon the suggestion, Sealy said to the woman: "I take you for my wife" and on being told that if she would say the same thing the marriage would be accomplished, answered: "To be sure he is my husband good enough". They continued to live together, as husband and wife, in the belief, up to the death of Sealy, that they were married. In the action before the lower court in that case the woman as "Mary Sealy" sought to recover the amount of personal property bequeathed to her by the will of "Henry Sealy, her late husband". As to the asserted common law marriage on the strength of the above testimony, Mr. Chief Justice TILGHMAN said: "Now these words of the woman do not constitute a present contract, but allude to the past contract, which she always asserted to be a lawful marriage . . . *what was done was too slight and too equivocal to establish a marriage.*" (Emphasis added). The *Hantz* case, in my view was more favorable, in material respects to recovery than the present action; yet the holding of the Supreme Court, refusing to construe the above language of the woman as creating a common law marriage contract, has been followed many times and cited with approval as late as *Pierce v. Pierce*. 355 Pa. 175, 49 A. 2d 346.

*Murdock's Estate,* 92 Pa. Superior Ct. 275 is another leading case most frequently cited along with the *Hantz* case, as a landmark on the phase of the law with which we are concerned. Both parties have cited

it. In that case the alleged widow, in claiming a share of the estate of Murdock, testified that a marriage contract had been entered into by her with the decedent in the following manner: "He said 'will you be good to me?' I said, 'Yes, I will do everything that a wife is supposed to do.' Well, we just decided then to say we were married and let it go at that." There was evidence of cohabitation and reputation over a period of years before Murdock's death. The holding of our then Judge KELLER was that in the absence of *verba de praesenti* there was no marriage contract and claimant was denied recovery.

It is not of real importance that in her claim petition appellee gave "1945" as the date of her alleged marriage with decedent, in the light of the fact that she went to live with Rager in 1942. But the following excerpts from her cross-examination cannot be ignored: "Q. You stated when you first went to live with Ira Rager in 1941 or 1942, he said to you, 'Come and live with me and make a home.' Is that right? A. Yes. Q. Now is that the only statement that was made at that time about you and he living together? A. Yes. Q. Do you remember telling [a] Mr. Rickert that there was no ceremony or oral agreement between you and Ira Rager? A. Yes, it was, I told him that, because my husband always said, 'Between the eyes of God we are husband and wife.' Q. You never had any agreement that you would be married? A. No. I thought that was enough. He was willing to make a home for me, I was willing to go with him. I think that ought to explain enough. Q. Well, in other words then, he needed a home, and you needed a home, and the two of you started to live together? A. Yes. Q. And the only agreement you ever made was when you started, he said, 'Come and live with me and make a home,' is that right? A. Yes." True, claimant apparently is

not of the highest intelligence. But the referee protected her interests and properly saw to it that her case was presented in the best possible light. Her answers in chief were to his leading questions, and counsel's cross-examination of her was considerate and within proper bounds. If a marriage contract had been entered into in words of the present she would have remembered them and certainly defendant's cross-examination called for testimony of the words of the contract, if contract there was.

A common law "marriage may be established by proof of reputation and cohabitation, declarations and conduct of the parties and such other circumstances as usually accompany the marriage relation" but in general, such evidence may be accepted as presumptive proof only *where direct evidence of what the parties said in making the contract is not available. Craig's Estate*, 273 Pa. 530, 533, 117 A. 221; *Nikitka's Estate*, 346 Pa. 63, 29 A. 2d 521. The rule which permits the finding of a marriage duly entered into based upon reputation and cohabitation alone is one of necessity to be applied only when other proof is not available. *McGrath's Estate*, 319 Pa. 309, 179 A. 599. Marriage is a civil contract which does not require a particular form of solemnization by church or by State, to make it valid. But in a ceremonial marriage *words,* in the phrase "I do", invariably insisted upon from both parties in response to direct questions of the officiating clergyman or civil officer, are essential to constitute a marriage contract. And *words* are equally if not more essential to the creation of a marriage at common law; "as a contract it must be evidenced by *words* in the present tense uttered with a view to establish the relation of husband and wife . . .": *Baker v. Mitchell,* supra. (Emphasis added). All of the authorities are to the same effect in adhering to the above familiar rule.

Cohabitation and reputation are not marriage and a presumption of marriage from them will wholly disappear in face of proof that no marriage in fact had taken place. Since evidence of the precise form of the alleged contract was available in the testimony of this claimant, the referee was bound to call her. *Nikitka's Estate,* supra, *Caddy v. Johnstown Firemen's R. Asso.,* 129 Pa. Superior Ct. 493, 196 A. 590. Claimant's testimony is not strengthened by the circumstances: Rager had previously been married and there is no evidence that the first marriage was other than ceremonial. The claimant and Rager lived together in Cambria County and in the City of Johnstown where at all times a clergyman or civil officer could be quickly and easily reached. There was no "exigency" indicating a common law marriage as the appropriate form of nuptial contract under the circumstances. (Cf. *Buradus v. Gen. Cement Prod. Co.,* p. 504, supra). And Rager's statement to claimant: "Between the eyes of God we are husband and wife" is at least equivocal and raises the question whether it refers to a valid marriage entered into by them (in which event it was unnecessary) or was made for the purpose of allaying claimant's conscience in acquiescing in a meretricious relationship. Since claimant's testimony indicated that there was no contract of marriage, the admitted cohabitation and reputation has no probative bearing in this case. In other words the controlling principle of law— conceded by the majority but ignored in its conclusion —is that a common law marriage cannot be proved by cohabitation and reputation where claimant's own testimony shows that no words of present assent were uttered with the intention of creating a common law marriage.

The importance of the question here is not merely whether compensation shall be paid to the woman in

this particular case. The implications of the majority opinion, if the law, will be to let down the bars for the future, and to require the acceptance of a lower degree of proof of marriage at common law than will still be required in every other form of marriage contract. The proofs essential to establish a common law marriage are the same regardless of the nature of the proceeding, or the tribunal in which the issue is tried. Bearing upon the quality of the requisite proofs our Supreme Court in *Stauffer Estate,* 372 Pa. 537, 540, 94 A. 2d 726, quoted with approval the following, from *Buradus v. Gen. Cement Prod. Co.,* 159 Pa. Superior Ct. 501, 48 A. 2d 883: "There has been a growing judicial impatience of the invitation to perjury in cases depending for recovery on marriage at common law and a progressive change in judicial view requiring *higher* degrees of proof where such marriages are asserted." (Italics supplied). And also this language of President Judge KELLER in *Baker v. Mitchell,* supra: "The law of Pennsylvania *recognizes* common law marriages. But they are a fruitful source of perjury and fraud, and, in consequence, they are to be *tolerated, not encouraged;* the professed contract should be examined with great scrutiny, and it should plainly appear that there was an actual agreement entered into, then and there, to form the legal relation of husband and wife: Stevenson's Est., [272 Pa. 291], pp. 296 and 301".

The inferences, from all of the testimony, most favorable to claimant do not prove a marriage in this case. With due respect for the views of my colleagues I feel obliged to lodge this dissent.

RHODES, P. J., and GUNTHER, J., join in this dissent.