**Ralph Raymond BESWICK, et al.**

v.

**CITY OF PHILADELPHIA, et al.**

No. 00–1304.

United States District Court,
E.D. Pennsylvania.

Dec. 6, 2001.

GILES, Chief Judge.

## I. INTRODUCTION

Ralph Raymond Beswick, Jr. and Rose Wiegand, Co–Administrators of the Estate of Ralph Richard Beswick, Sr., bring a constitutional claim pursuant to 42 U.S.C. § 1983 against the City of Philadelphia ("City") and its former 911 call-taker, Julie Rodriguez, and, asserting pendent jurisdiction, bring state law negligence claims against Julie Rodriguez, and Father and Son Transport Leasing Inc., d/b/a CareStat Ambulance and Invalid Coach Transportation, Inc. ("CareStat"), a private ambulance service, its record owner, Slawomir Cieloszcyk, a purported owner and manager, Gregory Sverdlev, and two CareStat employees, Ruslan Ilehuk and Ivan Tkach (collectively "CareStat defendants").

Before the court are four Motions for Summary Judgment filed by: (1) the City, for alleged failure to establish requisite municipal liability under Section 1983; (2) the CareStat defendants, for alleged failure to establish proximate cause; (3) the CareStat defendants, as to the claims of Wiegand, for alleged failure to establish that a common law marriage existed between her and the decedent; and (4) Sverdlev, Tkach, and Ilehuk, on the grounds that (a) employees of a corporation, absent individual negligence, cannot be held liable for the alleged negligence of that corporation, and (b) there is no competent evidence supporting the claim of Tkach and Ilehuk's employee negligence, and the claim of Sverdlev's ownership and employee negligence.

For the reasons that follow, the City's motion is granted, the CareStat defendants' motions are denied, and the motions of Sverdlev, Tkach, and Ilehuk are denied.

## II. FACTUAL BACKGROUND

Plaintiffs' claims all arise from the death of Ralph Richard Beswick, Sr. on February 11, 2000. The circumstances surrounding Beswick's death are described in detail in *Beswick v. City of Philadelphia,* Civ. A. No. 00–1304, 2001 WL 210292 (E.D.Pa. March 1, 2001), in which this court granted in part and denied in part the City's Motion to Dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(6).

Consistent with the review standards applicable to motions for summary judgment, Fed.R.Civ.P. 56(c), the alleged facts, viewed in the light most favorable to the plaintiffs, follow.

### A. The Events of February 11, 2000

On the evening of February 11, 2000, Ralph Richard Beswick, Sr. collapsed on the dining room floor of the South Kensington home that he and Wiegand had shared for 23 years. (Pl. Resp. to CareStat Ds' Mot. for Sum. J., Exh. J, Dep. of Ralph Raymond Beswick, at 12.) From the living room where she had been watching television, Wiegand heard the "thump" of Beswick falling and went to him.[1] Upon entering the kitchen and finding Beswick lying prone on the floor, Wiegand immediately dialed the City's medical emergency response number, 911, and told the answering call-taker, Julie Rodriguez, that Beswick had fallen and needed urgent assistance, and requested an ambulance. Rodriguez asked if Beswick was breathing. Wiegand responded that he was. Without obtaining any further information, Rodriguez told Wiegand that "somebody" was "on the way."

Fire Department regulations require 911 operators to refer all emergency medical calls to the Fire Department, which then dispatches Fire Rescue Units appropriately equipped and staffed to respond to medical emergencies. The mechanical protocol of the job of 911 call-taker requires that the call be transferred immediately to the dispatcher upon termination of the emergency call. The last step of the mechanical protocol of the call-taker job is to punch a sequential button on a console to connect the dispatcher and transmit the acquired information from the caller. The dispatcher forwards the call to the Rescue Unit closest to the response site.

Instead of following established procedure, which would have continued the process to trigger the Rescue Unit's response, Rodriguez abandoned protocol and used a telephone located next to her console to call a private ambulance company, CareStat, to see if it could respond to the Wiegand call. Rodriguez, without the knowledge of the City, had recently begun working for CareStat as a dispatcher in her off hours, and had a secret deal with CareStat to refer to it all calls received in her City 911 capacity that she believed CareStat could handle. Under the City's protocol, Rodriguez was required to treat all 911 calls as emergencies requiring the City's Rescue Unit response. She had no discretion to act otherwise.

Immediately after speaking with Wiegand, Rodriguez telephoned Slawomir Cieloszcyk (also known as "Slavik"), the owner and dispatcher of CareStat. Upon telling Cieloszcyk that Ralph Beswick, Sr. was age 65 and unconscious from a fall, Rodriguez asked how long it would take

---

1. There is some discrepancy in the record as to whether Wiegand went to Beswick immediately after he had fallen, or if some minutes had passed before she realized he had fallen. For the purposes of summary judgment, this court must assume that Wiegand went to him straightaway, as she indicated in her police statement taken eleven days after Beswick's death. (Pl. Resp. to CareStat's Mot. for Sum. J., Exh. G.)

CareStat to get to the Beswick home. (City Mot. for Sum. J., Exh. B.) Neither Rodriguez nor Cieloszcyk knew that the 911 call was, in fact, a situation other than an emergency, such as a heart attack or other serious medical event. (Id.) Cieloszcyk estimated a response time of fifteen minutes. He ended the conversation by saying, "We're on the way."

Arguably, corruptly, in violation of Pennsylvania's statutory requirements applicable to private ambulances, Cieloszcyk undertook a response to a medical situation to which CareStat was not authorized to respond. All 911 calls are assumed to be medical emergencies unless and until actual response and evaluation by the City Fire Department might determine otherwise. CareStat had no permission from the City to use 911 call-taker Rodriguez to refer calls to it and knew that the 911 call was being diverted from the City's established response system. Under these circumstances, Cieloszcyk nevertheless gave the Beswick response assignment to employees Ilehuk and Tkach, neither of whom had completed the requisite training to become a licensed EMT or paramedic. (Pl. Resp. to CareStat Ds' Mot., Exh. A, Page Interrogatories, at 18.) Ilehuk and Tkach, having the same knowledge as Cieloszcyk, including the deal with Rodriguez to compromise her City 911 job responsibilities, accepted the call and set out for the Beswick residence.

Ten minutes after the first 911 call had been made, because there was yet no emergency vehicle at the Beswick home, Wiegand's sister placed another 911 call at 8:02 p.m. to make sure that the City's rescue services had already been dispatched. This call also happened to have been received and handled by Rodriguez. Despite this second urgent call, Rodriguez did not punch it over to the City's emergency dispatch system. She called CareS-

tat again, seeking assurance that its ambulance dispatched would arrive soon. Cieloszcyk assured Rodriguez that the CareStat ambulance was on the way as he had promised her.

Because an emergency equipped unit still had not arrived, Wiegand called 911 a third time. The third call came to a call-taker other than Rodriguez. He followed all Fire Department procedures and within a very short time period a City Fire Department Rescue Unit arrived at the Beswick home. Rodriguez became aware of the third Wiegand call. She promptly called Cieloszcyk at CareStat and told him that a City paramedic unit was responding to the Beswick home, and requested that he hide her involvement in the misdirecting of the 911 calls. By the time that the CareStat ambulance arrived, the Fire Rescue Unit had already removed Beswick from the home. It was then that the Beswick family realized that the 911 call-taker had caused a private ambulance to attempt to respond to their emergency call, and that it was ill-equipped to have dealt with the Beswick medical emergency had it arrived earlier.

*B. The Delay in Response to Beswick because of Defendants' Actions*

The first emergency telephone call concerning Beswick was received by Rodriguez at the Fire Command Center ("FCC") at 19:53:41. The second call, placed by Wiegand's sister, was received by Rodriguez at 20:02:54. The third Wiegand call was received at the FCC by dispatcher Jose Zayes at 20:04:57, and the City Fire Department response was immediately dispatched.

Fire Battalion Chief William C. Schweizer confirmed that at the time Rodriguez received the first call at 19:53:41, Medic Unit No. 2 would have been available to respond from its base at Kensington and

Castor, which was within several minutes of the Beswick home. Medic Unit No. 2, like other City Medic Units, was staffed with paramedics, who have more training than EMTs. However, at 20:04:57, when Zayes received the third call, Medic Unit No. 2 was no longer available. Nor was the next closest Medic Unit, No. 8, based at Boudinot and Hart Streets. In response to the 20:04:47 call, Medic Unit 31, the third closest of the City's Medic Units, was dispatched from Second Street, and Fire Department Engine No. 7 was dispatched from Kensington and Castor. However, Engine No. 7 is staffed only with EMTs, and EMTs are not permitted to administer epinephrine or atropine to patients. Medic unit 31 took 8 minutes and 34 seconds to arrive at 959 East Schiller Street. Engine No. 7 took 3 minutes and 34 seconds to arrive. Engine No. 7 and Medic Unit No. 2—which was available for the first call but was never contacted by Rodriguez—were both based at Kensington and Castor, and would have had to travel the same distance to get to the Beswick residence. Based upon this information, the total delay in getting a Medic Unit to respond to Beswick has been estimated by Battalion Chief Schweizer to be 16 minutes and 16 seconds. (Pl. Resp. to CareStat Mots. for Sum. Jud., Exh. D, Schweizer Dep., at 28.) [2]

Plaintiffs have introduced evidence that this 16 minute, 16 second delay caused or contributed to the cause of Beswick's death, through the deposition testimony of Kale Etchberger and Joanne Przeworski, the two Fire Department paramedics who arrived on the scene as part of Medic Unit 31. Both testified that when they arrived, Engine No. 7's EMTs were already tending to Beswick. However, those EMTs,

unlike paramedics, cannot administer medications. As indicated in these paramedics' depositions, Engine No. 7's Lifepack 500 defibrillator machine received a "shock advised" message at 20:07:48, which suggests that at the time, Beswick was either in a state of v-fib or v-tack; in other words, his heartbeat was not totally flat. Additionally, upon the administration of medications by Etchberger and Przeworski, Beswick's heart rate was temporarily restored. Both paramedics testified that they believed he had a chance to be saved when they first came to the scene. (Pl. Resp. to CareStat Mots. for Sum. Jud., Exh E, Etchberger Dep, at 13; Exh. F, Przeworski Dep., at 12.) Plaintiffs' expert, Dr. Norman Makous, a cardiologist, would opine to a reasonable degree of medical certainty that based on established medical literature regarding observed cardiac arrests due to ventricular fibrillation, and assuming that Beswick was still breathing at the time of the first 911 call, that had Medic Unit No. 2 arrived after the first call, Beswick's chance of survival would have equaled, if not exceeded, thirty-four (34) percent. (CareStat Def. Mot. re Prox. Cause, Exh. C, Makous letter, at 3.)

### C. The Fire Department's Custom of Permitting Employees to Refer 911 Calls to Private Ambulance Companies

At the time of Beswick's death, the Fire Department's official policy permitted Medic Unit personnel to refer to private ambulance services persons to whom there had been a City Rescue Unit response if assessment at the scene was that the medical condition was not an emergency. Emergency Medical Services Bulletin 91–42 stated,

---

**2.** It is undisputed that Beswick died of a heart attack upon his arrival at the hospital. He was cremated two days later without an au-

topsy, so the exact magnitude of his heart attack can never be known.

All personnel assigned to Medic Units are reminded that it is not the Philadelphia Fire Department's policy to recommend private ambulance companies *by name* for non-emergency basic life support transportation. In instances where private ambulances are the appropriate mode of patient transportation, the decision as to which ambulance company will be contacted is to be left to the patient or the patient's family.

(Pl. Resp. to City Mot. for Sum Jud., Exh. C (emphasis added).) All private ambulance transports first had to be approved by a medical doctor at the basic command position, whom the medic units would phone with a detailed description of the patient's condition, as well as an estimated response time for a private ambulance. (City Mot. for Sum. Jud., Exh. K, Dep. of Samuel Chen, at 10–11.) This required medics—EMTs and paramedics—first to contact a private ambulance company in order to obtain an estimated response time before calling the basic command position. (Id.) Chen, a City paramedic, testified at his deposition that it was a widespread custom for paramedics following this procedure to refer non-emergency patients to specific private ambulance companies, and that he was not aware of the prohibition on recommending private ambulance companies by name, because he had not read it. It was posted on a bulletin board and not distributed to paramedics individually. He believed that paramedics were too busy responding to emergencies to read the bulletin board. (Pl. Resp. to City Mot. for Sum. Jud., Exh. H, Dep. of Samuel Chen, at 9.)

With knowledge of the City, some Fire Department EMTs and paramedics hold second jobs with private ambulance companies. According to the City's answers to interrogatories, as of February 11, 2000, there were: (1) 276 paramedics employed by the City Fire Department, 57 of whom had Fire Department permission to engage in employment outside of the City Fire Department with a private ambulance company; and (2) approximately 1,269 EMTs employed by the City Fire Department, of whom approximately 141 had Fire Department permission to engage in employment outside of the City Fire Department with a private ambulance company. In the results of a reverse telephone lookup of numbers that had been obtained from telephone records of two City Fire–Rescue personnel under suspicion of violating the City prohibition, six private ambulance companies, including CareStat, were identified as referred companies. (Pl. Resp. to City Mot. for Sum. Jud., Exh. I.)

However, it is undisputed that none of the 51 call-taker/dispatchers employed by the City Fire Department had Fire Department permission to engage in outside employment. Plaintiffs assert Rodriguez could have been influenced by what she might have heard or known that paramedics, like Chen, were able to do in referring medical conditions to private ambulance services for response and must have reasonably believed that her referral of the Beswick 911 medical event to CareStat would have been condoned by the City. There is no evidence that Rodriguez was motivated by any policy or lack of policy by the City. Nevertheless, plaintiffs would offer expert opinion that it would have been easy for Rodriguez, a City Fire Department employee, to become confused as to the boundaries or limitations of her call-taker job.

City policymakers were aware, through patient complaint forms submitted by 911 callers or their relatives, that the City's custom of permitting employee referrals to private ambulance companies had resulted in some instances where EMTs or paramedics had erroneously adjudged a pa-

tient's condition as non-emergency and refused to transport them. (Pl. Resp. to City's Mot for Sum. Jud., Exh. K.)

Six weeks after Beswick's death, on March 31, 2000, the City Fire Commissioner issued Memorandum No. 00–25, which stated,

> At no time are Philadelphia Fire Department employees permitted to initiate contact with a private ambulance service and/or refer or recommend a specific private ambulance service to a patient. The private ambulance service to be used must be chosen by the patient or the patient's representative.

(Pl. Resp. to City's Mot for Sum. Jud., Exh. B.)

### D. Rose Wiegand's Relationship with Decedent Ralph Beswick

Plaintiffs aver, through the deposition testimony of both Ralph Raymond Beswick, Jr. and Wiegand, that she and the decedent were together for 23 years, from 1977 until Beswick's death, during which they held themselves out as husband and wife. (Pl. Resp. to CareStat Mots., Exh. J. Dep. of Ralph Beswick, at 12.)[3] Wiegand's sister, Catherine Walerski, testified at her deposition that Wiegand had been "going with" Beswick for "about 27, 28 years." (CareStat Mot. re. Common Law Marriage, Exh. E, at 7.) Wiegand, who responds to both Mrs. Wiegand and Mrs. Beswick, had been legally married to Frank Wiegand, who passed away years before.

Rose Wiegand and Ralph Beswick did not obtain a formal, licensed marriage because Wiegand was concerned that this would have triggered a provision in her father's will necessitating the sale of her home, which she had inherited from her father on the condition that she never formally remarry, else it would have to be divided with her siblings. (Pl. Resp. to CareStat Mots. for Sum. Jud., Exh. I, Wiegand Dep., at 22.) Despite this prohibition, the two decided at some point to undertake the relationship of husband and wife, and to hold themselves out to the public as such. At his deposition, Ralph Raymond Beswick confirmed his father's intent to be married to Rose Wiegand:

> Q. Did your father ever come to you at any point and say I got remarried?
>
> A. He brought it up. I wasn't really asking. I think his intention was that Rose and him would be married. He didn't give a time, though.
>
>    .     .     .     .     .
>
> A. . . . He said we're married, don't worry about it, kid, like that.
>
>    .     .     .     .     .
>
> A. I think it was because of the fact my mother remarried. I mentioned that to him. He then proceeded to tell me that he was, in fact, married to Rose.

(Pl. Resp. to CareStat Mots., Exh. J, Beswick Dep. at 29–31.)

Walerski, Wiegand's sister, testified at her deposition that her sister and Beswick held themselves out to people as a married couple:

> Q. How would she introduce herself?
>
> A. Rose Wiegand.

**3.** At her deposition in August 2001, Wiegand testified that she and Beswick had only been together since approximately 1989, plaintiffs aver that this was a misrecollection due to a temporary lapse of her memory, as is supported by Wiegand's failure to remember other important dates at that time, such as the year of her youngest daughter's wedding, the year in which all of her children had left the house, and Beswick, who had been sleeping on the couch in her house up until that point, moved into the bedroom. (CareStat's Motion Re: Common Law Marriage, Exh. C, at 10–13.) For summary judgment purposes, this court will assume that Wiegand and Beswick had been living together 23 years.

Q. Did she go by any other names?

A. Not that I know of. Ralph's, I think. She was on his insurance.

Q. Beswick?

A. Beswick.

Q. Okay. But for the most part, it was Rose Wiegand?

A. Well, that's how I used to send her mail, like birthday cards and things like that.

\*    \*    \*    \*    \*    \*

Q. And did you know if Ralph and Rose would tell people that they were married-

A. I believe everybody thought that because they lived together so long. Just like the kids together.

Q. But it was your understanding that they would tell people they were married and act as if they were married?

A. I'm sure they did.

Q. And it was your understanding also that they did not formally get married because Rose understood your father's will to mean if she ever got married—

A. I believe that.

(CareStat Ds. Mot. re Common Law Marriage, Exh. E., at 10, 27.)

Wiegand similarly testified that she and Beswick considered themselves to be married from the time he moved into her house. (Pl. Resp. to CareStat Mots., Exh. I, Wiegand Dep., at 21.) They filed joint tax returns as husband and wife,[4] and since that time she has used the name Beswick, and they had held themselves out

as husband and wife to friends and neighbors. (Id. at 22–23, 53.) Though at times she used the "Wiegand" surname,[5] Wiegand went by the name "Mrs. Beswick" until Beswick's death. (Id. at 62.) Plaintiffs point to jointly filed tax returns, as well as prescription medications and credit cards obtained by Wiegand before Beswick's death, under the name "Rose Beswick." (Pl. Resp. to CareStat Mots., Exh. K.) She was covered under Beswick's insurance and pension as his wife, even though on his employee life insurance form, Beswick checked the box indicating that he was "single." (CareStat Def. Mot. re. Common Law Marriage, Exh. D.) In his retirement plan, Wiegand is specifically described as his spouse and "common law wife." (Pl. Resp. to CareStat Mots., Exh. K.)

### III. Discussion

Summary judgment under Federal Rule of Civil Procedure 56(c) is appropriate only if, drawing all inferences in favor of the non-moving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." *Taylor v. Peoples Natural Gas Co.*, 843 F.Supp. 51, 52 (W.D.Pa.1994), *aff'd*, 49 F.3d 982 (3d Cir.1995).

### A. City of Philadelphia—Section 1983 Liability

The City argues that summary judgment should be granted because plaintiffs

---

4. Plaintiffs have submitted copies of joint tax returns filed in 1996 and 1997, as well as a notice from the IRS, dated November 9, 1984, addressed to "Ralph and Rose Beswick," that Government had not received their income tax return for the tax period ending on December 31, 1982. (Pl. Resp. to CareStat Mots., Exh. K.)

5. CareStat defendants point out that, as indicated on the transcript of the first 911 call she made, Wiegand referred to herself as "Mrs. Wiegand," and to her alleged common law husband as "a fellow here." (CareStat D. Mot. re Common Law Marriage, Exh. A.)

are unable to establish the causal link between the Fire Department's policy regarding EMT and paramedic referrals of 911 patients who have been assessed to have non-emergency conditions to private ambulance companies, and Rodriguez's culpable conduct on the evening in question.

▬ To prevail against the City under Section 1983, plaintiffs must prove that the rights of Beswick were "violated as a result of a municipal policy or custom of deliberate indifference" to the rights of its citizens. *Simmons v. City of Philadelphia*, 947 F.2d 1042, 1064 (3d Cir.1991). In order for a Section 1983 claim to survive a motion for summary judgment, evidence must demonstrate (1) that a violation of a right secured by the Constitution and laws of the United States occurred and (2) that the alleged deprivation was committed by a person acting under color of state law. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 817, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985); *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1141 (3d Cir. 1995). This latter prong can only be established when the municipality itself causes the violation. *See Monell v. Dep't of Social Svcs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). "To establish municipal liability under *Monell*, a plaintiff must 'identify the challenged policy, [practice, or custom,] attribute it to the city itself, and show a causal link between the execution of the policy, [practice, or custom,] and the injury suffered.'" *Martin v. City of Philadelphia*, 2000 WL 1052150 (E.D.Pa.2000) (quoting *Fullman v. Philadelphia Int'l Airport*, 49 F.Supp.2d 434, 445 (E.D.Pa.1999)) (additional citations omitted). In addition, plaintiffs must "present scienter-like evidence of indifference on the part of a particular policymaker or policymakers." *Simmons*, 947 F.2d at 1060–61. The requirement of producing scienter-like evidence on the part of an official with policymaking authority is consistent with the conclusion that "absent the conscious decision or deliberate indifference of some natural person, a municipality, as an abstract entity, cannot be deemed to have engaged in a constitutional violation by virtue of a policy, a custom or failure to train." *Id.* at 1063. "[I]n the absence of any unconstitutional statute or rule, it is plaintiffs' burden to articulate a factual basis that demonstrates considerably more proof than a single incident." *House v. New Castle County*, 824 F.Supp. 477, 486 (D.Del.1993) (citing *Tuttle*, 471 U.S. at 823–24, 105 S.Ct. 2427).

Plaintiffs contend that they have established that the City had a two-fold custom that was the proximate cause of Beswick's death: (1) to permit City Fire Department employees to moonlight for private ambulance companies; and (2) to condone the referring of 911 patients, deemed by EMTs or paramedics at the scene not to constitute a medical emergency, to private ambulance companies for transport. Plaintiffs assert that these customs, working in tandem, served to create an environment where City Fire Department employees would feel authorized to believe that they had discretion in certain areas when they had none. Plaintiffs submit the following conclusions of their expert witness, James Page, on the administration and deployment of emergency medical services:

> The Fire Department either had no clear prohibition against the referral of patients to private ambulance companies (a prohibition which they clearly did institute after the Beswick incident), or did not enforce any policy which might have been in effect at the time of the Beswick incident. This is a violation of [Section 1983] as follows: the Philadelphia Fire Department (PFD), through its policymakers and administrators, had a custom and practice of allowing its

employees, such as Julie Rodriguez, to "moonlight" for private ambulance companies. This custom established a conflict of interest and created the very environment in which Ralph Beswick died while waiting for a private ambulance ill equipped to handle his situation. But for the City's custom and practice of permitting close association and working relationships between its employees and private ambulance companies, Ralph Beswick would have been treated promptly by City personnel with the requisite skill and equipment, and would have lived (as per the testimony of cardiologist Norman Makous, M.D.).

(Ps' Resp. to City Mot. for Sum. Jud., Exh. L, Pls. Answers to Expert Interrogs. Submitted on Behalf of James Page, at 19.)

■ However, plaintiffs have introduced no evidence that the particular "custom" relied upon by Page existed. While for summary judgment purposes plaintiffs have demonstrated that EMTs and paramedics had permission to moonlight for private ambulance companies, nothing in the record shows that call-takers like Rodriguez had such permission. The conflict of interest theory of liability falls because Rodriguez had no City authorization to work for CareStat. Page would then rely on the "custom" of permitting private ambulance EMTs and paramedics, for conditions not deemed emergencies, and after physical evaluations, to refer such to private ambulance companies, and offers that simply because she was a Fire Department employee, although not a part of a Rescue Response Unit, she could have felt that if paramedics and EMTs could make refer-

rals to private insurance companies with impunity, she could also. This theory fails factually and as a matter of law.[6]

Plaintiffs have introduced no evidence that could establish a genuine issue of material fact as to Rodriguez's motives for agreeing to forward calls to CareStat. Although Rodriguez was training to become a paramedic, and associated with some City Fire Department paramedics, (Pls. Resp. to City Mots., Exh. M., Rodriguez Investigation Report, at 4), there is no evidence that she was aware of the City's referral policy or custom with respect to EMTs and paramedics or that she did not know and understand fully that her job required her to refer all 911 calls through to the City's Fire Department dispatcher without exception. If she knew about the alleged custom, she necessarily knew the limited circumstances under which paramedics and EMTs, and only paramedics and EMT's, could make such referrals. It is undisputed that she was not a paramedic or EMT certified by the City. Rodriguez had to know that when she was cooperating with CareStat she was not doing her job for the City.

As a matter of law, the theory fails because it could not have been reasonably foreseeable that call-takers, who have no discretion in the forwarding of calls to the dispatcher for emergency response, would divert an emergency call to a private ambulance company. There is no evidence that any 911 call-taker previously had diverted a call to a private ambulance company for response. Nor is there evidence that the City knew that any 911 call-taker

6. Although the theory is not fully established in plaintiffs' submissions, the court assumes that plaintiff is arguing a connection between EMT and paramedic moonlighting and their ability to assess accurately patients conditions *viz.* forwarding calls to private ambulance companies. In other words, plaintiffs' theory

assumes an inherent conflict of interest, and that the complaints of 911 patients who claim they were forced by Fire Department employees to use a private ambulance in an emergency situation reflect that impermissible bias.

worked for a private ambulance company as a second job. Hence, there is no factual basis for jury consideration of City knowledge of a dangerous condition among 911 call-takers that connects to private ambulance companies.

The record evidence demonstrates unequivocally that Fire Department policy specifically foreclosed 911 call-takers and dispatchers from exercising any discretion with respect to forwarding all 911 calls through to Fire Department Rescue Units for response. (City Mot. for Sum. Jud., Exh. F, Moore Dep. (Chief Fire Dispatcher for FCC), at 44.) Even the mechanics of the call-taker job eliminated discretion. Rodriguez was required to enter information from the 911 caller into fields on a computer screen, and then to press a button as the final sequence which sent essential information onto the Fire Department dispatcher for ambulance and/or fire engine dispatch to the nearest available unit.

■ Plaintiff's theory against the City boils down to this. The City failed to make clear to all Fire Department employees, whether they be janitors, clerical workers, or call-takers, that they are not permitted to initiate contact with private ambulance services on behalf of a patient or 911 caller. In the absence of some prior specific related event that would create such a duty, plaintiffs' theory amounts at best to a claim of mere negligence—that the captain, the City, could have run a better ship, and not that the captain knew or ought to have known that the ship was sinking and did nothing. Mere negligence does not suffice to establish liability under Section 1983. *Estate of Bailey by Oare v. York County,* 768 F.2d 503, 508 (3d Cir. 1985); *LARA, Inc. v. South Whitehall Twnshp.,* 729 F.Supp. 415 (E.D.Pa.1989); *Agresta v. City of Philadelphia,* 694 F.Supp. 117 (E.D.Pa.1988). The alleged EMT/paramedic custom requires City Rescue Units to respond to the scene, to evaluate the patient in person. The attempted connection between that alleged custom and a lone call-taker's decision to circumvent the Fire Department's computer entry system and forward 911 calls to private ambulance companies amounts to impermissible speculation.

Since there is no evidence that any City call-taker or dispatcher had previously forwarded 911 calls to private ambulance companies or even worked second jobs with private ambulance companies, it is impossible to prove that the City knew or reasonably should have known that its EMT/paramedic referral policy would lead to the forwarding of a 911 by a call-taker/dispatcher to a private ambulance company. *See House,* 824 F.Supp. at 486; *Tuttle,* 471 U.S. at 823–24, 105 S.Ct. 2427 (finding that proof of more than a single incident is necessary to fulfill plaintiffs' burden to establish deliberate indifference).

For these reasons, this court grants the City's motion for summary judgment.

*B. Wiegand's Relationship with Mr. Beswick*

CareStat defendants contend that, under Pennsylvania law, Wiegand's relationship with Beswick did not meet the requirements of a common law marriage. CareStat defendants argue that Wiegand's deposition testimony, in which she estimates that she had been living with Beswick only since 1989, should be given controlling weight by this court. Further, there is no indication in the record that Wiegand and Beswick ever exchanged specific, formal words to formulate a marriage. Rather, CareStat defendants proffer, the fact that Wiegand stood to lose the house that she inherited from her father if she remarried indicates that her intent was *not* to form a marriage with Beswick. This, coupled

with the fact that Beswick checked the "single" box on his life insurance form, as well as Wiegand's references to herself and Beswick on the 911 transcript, and the deposition testimony of Wiegand's sister, CareStat defendants argue, suffices to establish, as a matter of law, that no common law marriage existed between Beswick and Wiegand. If Wiegand, as a matter of law, cannot establish a common law marriage, then plaintiffs' claim for negligent infliction of emotional distress (Count VII) must be dismissed. *See Blanyar v. Pagnotti Enterprises, Inc.,* 451 Pa.Super. 269, 679 A.2d 790, 791 (1996) (finding that in order to maintain a claim for negligent infliction of emotional distress, *inter alia,* plaintiff must have been located near the scene of the accident and be a close relative of the victim). Further, if Wiegand is not found to be Beswick's common law wife, plaintiffs' survival claim (Count VI) must also be dismissed, because, if she were not his spouse, she would not be able to receive the social security benefits for the estate in a survival action.[7]

■ The determination of whether plaintiff Rose Wiegand was the common law wife of Beswick is a mixed question of law and fact. *Brandywine Paperboard Mills v. W.C.A.B. (Zittle),* 751 A.2d 1205 (Pa.Cmwlth.App.2000); *Duggan v. Workmen's Compensation Appeal Board (Litchfield Township),* 131 Pa.Cmwlth. 184, 569 A.2d 1022 (1990). Whether a valid common law marriage existed is a jury question. *Knecht v. Knecht,* 261 Pa. 410, 104 A. 676, 677 (1918). In the presence of sufficient facts to support a claim of common law marriage, the question becomes one for a jury to decide. *State Farm Fire & Casualty Co. v. Platt,* 4 F.Supp.2d 399, 405 (E.D.Pa.1998).

■ Under Pennsylvania law, marriage is a civil contract made between parties with the capacity to so contract. *See Platt,* 4 F.Supp.2d at 404 (citing *In re Garges,* 474 Pa. 237, 378 A.2d 307, 308–09 (1977)). Pennsylvania recognizes the validity of common law marriages, and the burden of proving such a marriage is on the purported spouse. *See Platt,* 4 F.Supp.2d at 404 (citing *In re Gavula,* 490 Pa. 535, 417 A.2d 168, 171 (1980)). The court in *Platt* went on to describe what is required in Pennsylvania to establish a common law marriage:

> Given that proving the existence of a marriage contract is difficult absent the standard ceremonial formalities, Pennsylvania law has set forth certain rules and presumptions to aid courts in determining whether a common law marriage has been formed. *See [Garges,* 378 A.2d] at 309. In general, a common law marriage requires *verba de praesenti,* or words in the present tense uttered for the purpose of establishing the relationship of husband and wife. The words need not be formalized. Word (sic) of taking or explicit performative utterances, such as "I take you to be my wife" or "I hereby marry you" are unnecessary. All that is essential is proof of an agreement to enter into the legal relationship of marriage at the present time. *See Garges,* 378 A.2d at 309.

> In light of the difficulties in proving a common law marriage, the law has created a rebuttable presumption of marriage where two absolutely essential elements co-exist, namely: 1) constant cohabitation between a man and a woman, both of whom have the capacity to be married; and 2) general, as distin-

---

**7.** Social security benefits would be the only damages to which Wiegand would be entitled in a survival action, since Beswick had retired three years prior to his death and thus had no lost wages, and plaintiffs have not alleged, nor is their evidence of, pain and suffering.

guished from partial or divided, reputation as husband and wife in their community. *See In re Gavula*, 417 A.2d at 171 n. 7; *Garges*, 378 A.2d at 309; *see also McKenzie v. Harris*, 679 F.2d 8, 10–11 (3d Cir.1982) (no *verba de praesenti*, but evidence of intention to be married and reputation and cohabitation evidence sufficient to support finding of common law marriage); *Commonwealth v. McLean*, 387 Pa.Super. 354, 564 A.2d 216, 220–221 (1989) (finding that a common law marriage is evidenced from *verba de praesenti* or, that cohabitation and reputation are circumstances from which the existence of a contract of marriage can be inferred, but that the requirements are not conjunctive).

4 F.Supp.2d at 404.

■■■ In the instant case, while there is no indication that Wiegand and Beswick ever exchanged formal words to this effect, there is a great deal of documentary support for the proposition that they both lived together and held themselves out to the community as husband and wife for an uninterrupted period of years. Defendants cite to no case indicating Wiegand's [erroneous, according to plaintiffs] testimony that she and Beswick had lived together for only 11, not 23, years is relevant to their establishing a common law marriage, *cf. Rager v. Johnstown Traction Co.*, 184 Pa.Super. 474, 134 A.2d 918, 920–21 (1957) (finding evidence as to cohabitation and reputation as husband and wife for approximately 11 years until death of husband was sufficient to establish a presumption of a valid common-law marriage contract), and even if they had, an issue of material fact would still exist as to the length of their relationship. Deposition testimony of Beswick's son and Wiegand's sister clearly indicate that, while the couple did not want to be married in a legal ceremo-

ny, they considered themselves to be married, and were treated by their friends and relatives as such. Wiegand's concern about losing her house if she participated in a legal marriage ceremony could very likely convince a jury that she and Beswick considered themselves to be married, because they never indicated any intent to hold an official wedding ceremony. Defendants point out that Wiegand's sister still addressed birthday cards and letters to her under the "Wiegand" name, and that, while under the extreme stress immediately following Beswick's collapse, she referred to herself as "Mrs. Wiegand" when she called 911. Whether these instances are material to how Wiegand and Beswick held themselves out to the community is for a jury to decide, because the court finds that plaintiffs have established a genuine issue of material fact regarding their alleged common law marriage.

### C. Loss of a Chance Theory of Proximate Cause

CareStat defendants argue that on its face, a statistical survival rate of 34 percent, which plaintiffs' medical expert concludes is the chance for survival Beswick would have had if a City ambulance had been appropriately dispatched, is insufficient as a matter of law to establish proximate cause. In the alternative, CareStat defendants argue that additional factors unique to Beswick, such as preexisting heart and stroke conditions, as well as chronic obstructive pulmonary disease, necessarily served to reduce his chances of survival well below 34 percent; further, they contend that Wiegand's deposition testimony indicates that she waited "five or ten minutes" before responding to Beswick's collapse, therefore Dr. Makous' conclusions, which are based on *observed* cardiac arrests, are inadmissible. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469

(1993) (holding that when expert testimony's factual basis, data, principles, methods or their application are called sufficiently into question, the trial court must determine whether the testimony has a reliable basis in the knowledge and experience of the relevant discipline).

### 1. For Purposes of Summary Judgment, Beswick's Chance of Survival, Absent Defendants' Negligence, was 34 Percent.

■ Addressing defendants' alternative argument first, for summary judgment purposes, this court must accept plaintiffs' allegation that Wiegand heard Beswick collapse and responded immediately, as she stated in the police report taken eleven days after Beswick's death. Further, Dr. Makous' conclusions are predicated upon an article from the New England Journal of Medicine, which states that "the rate of survival to hospital discharge for patients with a witnessed collapse who are found to be in ventricular fibrillation is 34 percent." Mickey S. Eisenberg, M.D., Ph.D., & Terry J. Mengert, M.D., "Cardiac Resuscitation," N. Eng. J. Med., vol. 344, no. 17, at 1304 (April 26, 2001). The article further states that "[w]hen cardiopulmonary resuscitation is started within four minutes after collapse, the likelihood of survival to hospital discharge doubles." Id. at 1305. Viewing all facts of record in the light most favorable to plaintiffs, this court must assume that Wiegand called 911 immediately after Beswick's collapse, and that at that time, Medic Unit No. 2, with licensed paramedics, was available for dispatch and 3 minutes and 34 seconds from the Beswick residence.[8] Thus, a jury could conclude that Beswick's chances for survival were at least 34 percent, if not more, had the 911 call not been diverted to CareStat. More-

over, the 34 percent survival rate noted in the article and in Dr. Makous' conclusions does not assume only patients who are experiencing their first cardiac arrest, or patients without other pre-existing conditions. Thus, for the purposes of summary judgment, the court must assume that the factors surrounding the cardiac arrest of an individual with Beswick's medical history were taken into account by both the article and Dr. Makous.

■ Federal Rule of Evidence 702 states, "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." The Court in *Daubert* listed four factors courts should consider in determining reliability under Rule 702:(1) whether the theory or technique can be tested; (2) whether it has been subjected to peer review; (3) whether the technique has a high known or potential rate of error; and (4) whether the theory has attained general acceptance within the scientific community. 509 U.S. at 593–94, 113 S.Ct. 2786. The proponent of the testimony does not have the burden of proving that it is scientifically correct, but that by a preponderance of the evidence, it is reliable. *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir.1994).

The court finds Dr. Makous, a licensed physician who has spent more than fifty years practicing cardiology, is basing his

---

**8.** The article does not specify whether the start of CPR within four minutes after cardiac

arrest doubles the 34 percent chance of survival, or if it refers to some other statistic. *Id.*

opinions upon established modern medicine, stated, *inter loci,* in the New England Journal of Medicine, and thus is scientifically reliable for the purposes of *Daubert.* The 34 percent probability that Dr. Makous cites should not be confused with the degree of his medical certainty as to the accuracy of that opinion.

### 2. Loss of a Chance

Pennsylvania tort law follows the Restatement Second of Torts, § 323, which provides:

> s 323. Negligent Performance of Undertaking to Render Services One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) *his failure to exercise such care increases the risk of such harm,* or (b) the harm is suffered because of the other's reliance upon the undertaking.

(emphasis added). *See Hamil v. Bashline,* 481 Pa. 256, 392 A.2d 1280, 1286 (1978). In *Hamil,* plaintiff's husband, who was suffering from severe chest pains, was brought to the defendant hospital. Due to a faulty electrical outlet, the EKG machine failed to function. A second EKG machine could not be found and, upon receiving no further aid or treatment, Hamil transported her husband to a private doctor's office, where he died of cardiac arrest while an EKG was being taken. Plaintiff's expert witness estimated that the decedent would have had a 75 percent chance of surviving the attack had he been appropriately treated upon his arrival at the hospital. Following the introduction of all evidence, the

trial court determined that plaintiff's medical expert had failed to establish, with the required degree of medical certainty, that the alleged negligence of the defendant was the proximate cause of plaintiff's harm, and directed a verdict for the defendant. The Supreme Court reversed, finding that cases such as this "by their very nature elude the degree of certainty one would prefer and upon which the law normally insists before a person may be held liable." *Id.* at 1287. The court interpreted the effect of § 323(a) of the Restatement as to address these situations, and relaxed the degree of evidentiary proof normally required for plaintiff to make a case for the jury as to whether a defendant may be held liable for the plaintiff's injuries. Accordingly, the court adopted the following standard:

> Once a plaintiff has introduced evidence that a defendant's negligent act or omission increased the risk of harm to a person in plaintiff's position, and that the harm was in fact sustained, it becomes a question for the jury as to whether or not that increased risk was a substantial factor in producing the harm. Such a conclusion follows from an analysis of the function of Section 323(a).

*Id.* See also *Jones v. Montefiore Hospital,* 494 Pa. 410, 431 A.2d 920 (1981); *Mitzelfelt v. Kamrin,* 526 Pa. 54, 584 A.2d 888 (1990).

■ In determining the burden of proof required ultimately to warrant a jury verdict for the plaintiff, the *Hamil* court again relied on the Restatement Second of Torts, which reflected the state of the law at the time of its adoption in 1965; namely that the quantum of proof, or "substantial factor," necessary is a preponderance of the evidence. 392 A.2d at 1288 n. 9 (citing Restatement (Second) of Torts § 433B, comment (a)).[9] Accordingly, this court will

---

**9.** Comment (a) of Section 433B states:

a. Subsection (1) states the general rule as

permit Dr. Makous' testimony regarding the increased risk of harm to Beswick of 34 percent, and will allow the jury to determine, by a preponderance of the evidence, whether this increased risk brought about Beswick's death.

Since *Hamil* was decided, several states have altered their standards for establishing liability in medical malpractice cases. Part (f) of § 4 Restatement (Third) of Torts (1999 Main Vol.) (Proof of Plaintiff's Negligence and Legal Causation) addresses these theories of lost chance as they have been adopted by those states:

> f. Lost chance. In some jurisdictions a plaintiff can recover for a lost chance of recovery from a disease or medical condition (or for other increased risk of harm). Where the harm for which the plaintiff seeks to recover is the lost chance itself, the plaintiff's negligence in causing the loss of chance reduces the plaintiff's recovery under §§ 7. Such a rule is not a burdenshifting rule on the issue of causation, but a rule about what constitutes the plaintiff's compensable injury. In some jurisdictions, the lost chance doctrine allows a plaintiff to recover damages for the entire injury on a showing that the defendant substantially increased the risk of that injury. In those jurisdictions, if the plaintiff uses the doctrine of lost chance to prove that the injury was caused by the defendant's negligence, the defendant may use the doctrine of lost chance to prove that the injury was caused by the plaintiff's negligence. Otherwise, the defendant may not use the doctrine of lost chance to prove that the plaintiff's injury was caused by the plaintiff's negligence. The rule stated in this Comment does not affect the ability of a plaintiff or defendant to prove causation by a preponderance of the evidence—i.e., more likely than not—by use of statistical evidence.

The doctrine of loss of chance has two versions. Under one, the plaintiff can recover only for the value of the lost chance. *See, e.g., Thompson v. Sun City Community Hosp.*, 141 Ariz. 597, 688 P.2d 605, 616 (1984); *Blackmon v. Langley*, 293 Ark. 286, 737 S.W.2d 455 (1987); *DeBurkarte v. Louvar*, 393 N.W.2d 131 (Iowa 1986); *Roberson v. Counselman*, 235 Kan. 1006, 686 P.2d 149 (1984); *Hastings v. Baton Rouge Gen. Hosp.*, 498 So.2d 713 (La.1986). Under this theory, the burden of proof for causation is not changed; rather, the injury is defined as the loss of a chance in itself, as opposed to the resultant harm to the plaintiff. With the injury thus defined, a plaintiff is able to prove causation for that injury under the traditional preponderance test. Recovery is generally the percentage of the damages defendant was found to have caused.

Under the other version of the lost chance doctrine, the nature of plaintiff's injury remains unchanged; rather, the court permits a lower burden of proof, allowing plaintiff to prove that the defendant caused the injury, even though plaintiff cannot prove more likely than not, but for the defendant's negligence, the injury

---

to the burden of proof on the issue of causation. As on other issues in civil cases, the plaintiff is required to produce evidence that the conduct of the defendant has been a substantial factor in bringing about the harm he has suffered, and to sustain his burden of proof by a preponderance of the evidence. This means that he must make it appear that it is more likely than not that the conduct of the defendant was a substantial factor in bringing about the harm. A mere possibility of such causation is not enough; and when the matter remains one of pure speculation and conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant.

would not have occurred. *See, e.g., Falcon v. Memorial Hosp.,* 436 Mich. 443, 462 N.W.2d 44 (1990), *superceded by statute,* Mich. Comp. Laws Ann. § 600.2912a(2) (1994); *Herskovits v. Group Health Cooperative of Puget Sound,* 99 Wash.2d 609, 664 P.2d 474 (1983); *Alberts v. Schultz,* 126 N.M. 807, 975 P.2d 1279 (1999).

Pennsylvania law has not adopted either of these approaches.

### D. Negligence of Ilehuk and Tkach

The CareStat defendants seek dismissal of Tkach and Ilehuk on the grounds that any negligence on their part could not have been a proximate cause of the death of Beswick because they arrived after the Fire Department, and thus never participated in the care of Beswick. Plaintiffs argue that it is not the lack of qualifications of these defendants that caused the delay in Beswick's treatment. Rather, they claim that these defendants should have turned down the assignment because of their lack of qualifications, which contributed to the delay in medical attention. Plaintiffs assert, and defendants do not dispute, that Ilehuk and Tkach had not yet completed their training as paramedics. Thus, plaintiffs contend, those defendants' acceptance of the 911 call was improper as a matter of Pennsylvania statutory law. (Pl. Resp. to CareStat Mots., Exh. A. Page Interrogs., at 18.) Because of the breach of their duty to refuse a call for a residential transport, defendants caused a delay which allegedly was the proximate cause of Beswick losing all chance of survival.

### E. Liability of Sverdlev

CareStat defendants seek the dismissal of Sverdlev because they claim he was only an employee, not an owner, of CareStat. Sverdlev is not alleged to have engaged in any negligent acts directly. In support of their argument of lack of ownership, CareStat defendants submit a copy of CareStat's Certificate of Incorporation, which lists only Cieloszcyk, not Sverdlev, on CareStat's board of directors. (CareStat Ds. Mot. re employee liability, Exh. B.)

■ Plaintiffs offer that the evidence submitted shows that Sverdlev is an actual owner of the business. Allegedly, he was precluded from operating an ambulance company such as CareStat because he was arrested in New Jersey for theft by deception and Medicare Fraud with regard to a prior ambulance company, and has masked his ownership of CareStat in Pennsylvania. Although his name is not on any CareStat corporate documentation, plaintiffs allege they can establish that he was the true owner of CareStat. Plaintiffs have submitted an affidavit from Philadelphia Police Detective Robert Burke, stating that when he interviewed George Stolle, a former CareStat employee, he stated that Sverdlev was the owner of CareStat. (Pls. Resp. to CareStat Mots., Exh. L, Aff. of Prob. Cause., at 5.) Plaintiffs also submit affidavits from Stolle and other former CareStat employees, Aleksey Lomov, Olga Lamova, and Gary Dubin, all of which concluded that Sverdlev is an owner of CareStat. (Pls. Resp. to CareStat Mots., Exhs N, O, P, & R.) Further, in his police statement, Tkach also stated that he believed that Sverdlev is only a half-owner of CareStat. (Id., Exh. Q.) For purposes of summary judgment, the court finds that these submissions create a genuine issue of material fact as to whether Sverdlev is an owner of CareStat. The court also notes that plaintiffs have established, for summary judgment purposes, that Sverdlev managed the day-to-day operations at CareStat and thus knew or could have known of Rodriguez's improper agreement with CareStat to forward 911 calls to the private ambulance company.

In the alternative, Sverdlev argues that even if he is found to be an owner, plaintiffs would not be able to recover from him personally because there is no allegation that CareStat was abusing the corporate form such that piercing the corporate veil would be warranted. *Pearson v. Component Tech. Corp.*, 247 F.3d 471 (3d Cir.2001). The court disagrees. "The corporate entity may not be used to defeat public convenience, justify wrong, protect fraud or defend crime, and the form will be disregarded whenever justice or public policy demand." *Parker v. Bell Asbestos Mines, Ltd.*, 607 F.Supp. 1397, 1402 (E.D.Pa.1985) (citing *Ashley v. Ashley*, 482 Pa. 228, 393 A.2d 637, 641 (1978); *Sams v. Redevelopment Auth.*, 431 Pa. 240, 244 A.2d 779, 781 (1968)). Although limitation of liability is a legitimate benefit of incorporation, that benefit is lost where the corporate form is resorted to " 'deliberately, with specific intent to escape liability for a specific tort or class of torts.' " *Parker*, 607 F.Supp. at 1403 (quoting *Zubik v. Zubik*, 384 F.2d 267, 273 (3d Cir. 1967), *cert. denied*, 390 U.S. 988, 88 S.Ct. 1183, 19 L.Ed.2d 1291 (1968)).

## IV. CONCLUSION

For the foregoing reasons, the City's Motion for Summary Judgment is granted, the CareStat defendants' Motions are denied, and Sverdlev, Tkach, and Ilehuk's Motion is denied.

An appropriate order follows.

## ORDER

AND NOW, this ___ day of December 2001, upon consideration of Defendants' Motions for Summary Judgment, and the arguments of the parties, for the reasons outlined in the attached memorandum, it is hereby ORDERED that the City of Philadelphia's motion (Docket # 64) is GRANTED, and CareStat Defendants'

three motions (Docket # # 61, 62, & 63) are DENIED.